JOSEPH A. WING, ADMINISTRATOR OF THE ESTATE OF SARAH
HOOPER v. ISAAC N. HALL AND J. R. DARLING.*

*Taxes. Sale of land by Collector of Land-Tax. Evidence of
Oath. Advertisement. Tax-Bill. Town Clerk's Cer-
tificate. Evidence. Practice. Deposition. Ad-
verse Possession. Estoppel. Deed.*

A warrant for the collection of a land-tax, recited the assessment of the tax by the
legislature, the appointment of the collector, naming him, and was in the usual
form, defining the duties of the collector. Immediately following the record of the
warrant, was a record of the certificate of the oath, which recited that the collector,
naming him, "personally appeared, and was duly sworn to perform the duties as-
signed him as collector of said tax in and by the above warrant, as the law directs."
*Held*, that such oath answered the requirement of the statute.

The advertisement of a committee appointed to superintend the expenditure of a land-
tax, notifying the land-owners of the time when they can work out their taxes,
need not name the town where the legislature sat when the act assessing the tax
was passed.

The record showed that a schedule of the lands subject to such tax, was furnished to
the collector, wherein the names of the original grantees, the divisions, numbers,
and description of the lots, the number of acres taxed in each lot, and the amount
of the tax, appeared. Immediately following this, was the record of the collector's
return of his proceedings, wherein he certified, "that the foregoing are true records
and entries of my proceedings in the collection of the tax therein described." *Held*,
that this was sufficient to establish, *prima facie* at least, that such a tax-bill was
furnished to the collector as the law required.

The town clerk's certificate immediately following the record of such committee's and
collector's advertisement, was * * * "that the above is a true copy of the origi-
nal advertisement, as published in [giving the names, volumes, numbers, and dates
of the several newspapers]; which nine newspapers, each containing an advertise-
ment of which the above is a copy, have, this 13th day of June, 1833, been pre-
sented to me at my office by John Taisey, the collector, for record; and have been
severally examined and carefully compared with the above copy by me." *Held*, suf-
ficient in form.

In the absence of proof to explain what appears of record as to the time when an in-
strument was in fact recorded, the legal presumption is, that it was recorded when
received for record.

An objection to a tax sale and proceedings, "for other defects on the face of the
papers, apparent of record," is too vague and indefinite for consideration.

No title passes under a land-tax collector's deed, unless the committee's account has
been approved by the county court as required by statute; and it devolves upon the
party claiming under such deed, to show such approval.

A party who takes and files a deposition which he does not use on trial, is not bound
to permit his adversary to use it.

* This case was heard at the General term in October, 1873, and the opinion
delivered at this term.

Wing, administrator, *v.* Hall et al.

The vendee at a land-tax sale that was admitted to be invalid, entered upon the land, claiming title, and cut timber thereon for the purpose of taking possession, and subsequently obtained a deed thereof from the collector. *Held*, that the sale gave him no right to enter upon the land, certainly until the time of redemption had expired, and no color of title that would extend his possession, constructively, beyond the limits of the land actually occupied, and that his *color of title* must be restricted to the time of obtaining his deed.

An entry upon land in the possession of another, in order to work a legal interruption of such possession, must be made under such circumstances as to enable the party in possession, by the use of reasonable diligence, to ascertain the right and claim of the party making the entry.

To show that the plaintiff's possession of the demanded premises had been interrupted, the defendants introduced a witness who testified to acts done thereon and claims made thereto by him in 1865, under a certain title. *Held*, that the plaintiff might show, as bearing upon the question of what claim the witness made to the lot at the time of his entry, that in 1866, while he was still claiming the lot, but had acquired no right thereto, and before the defendants had any interest therein, the witness being upon the lot, and in full view of the part where he had done the acts testified to, was asked by what title he claimed, and replied that he claimed under a title other than the one he testified that he claimed under.

Collateral matter drawn out on cross-examination cannot be contradicted by the cross-examining party.

Title of a portion of the demanded premises was decreed to the plaintiff in a suit in his favor against the defendants and others. The defendants obtained a deed of the premises, *pendente lite*, but the title under that deed was not in issue nor litigated in that suit, although the defendants might have been permitted to set it up, on application made at any time before final decree. *Held*, in ejectment subsequently brought by the plaintiff, that the defendants were not estopped by the decree from setting up title under said deed.

Acts done upon land by the license of another, are to be considered the same as though done by the licensor; and they enure to the benefit of the party holding the title under which the licensor took possession.

M. held a tax deed of the demanded premises that was not shown to be valid, and which was never recorded. He conveyed whatever title he obtained by it, to P., and acquired no possessory title. Page, under parol agreement of purchase with P. did acts of possession on the land. P. willed his property to C., and died. Subsequently, R. under an arrangement with Page, entered upon the land, claiming to own it, and cut timber and did other acts thereon, and afterwards bargained for C's interest therein. The defendants relied upon R's entry and acts, to interrupt the possession of the intestate. *Held*, that if done, claiming under the title of M., they could not have that effect.

P's will was never probated in this state; and rather than have it probated, and the estate settled here, so that C. could deed said premises to the defendants, C. procured M. to deed to them, and received the consideration therefor. *Held*, assuming that whatever title M. acquired by his deed, could be assigned in the manner attempted, that the possessory title which the defendants' testimony tended to show had been acquired by P. and those claiming under him, did not pass to the defendants by M.'s deed to them; and that the defendants could not justify thereunder, as against a party having a prior possession.

The special findings of a jury are not available to the party in whose favor they are, when based upon evidence improperly admitted, and erroneous directions of the use to be made thereof.

EJECTMENT for lot No. 70 in the third division in the town of Groton. The writ contained two counts ; one for the whole lot, and one for three acres of the south-east corner of the lot, on which stood the Lake House Hotel, so called. Plea, the general issue, and trial by jury, June term, 1873, Caledonia county, Ross, J., presiding.

The plaintiff, to support the issue on his part, offered the record of a public sale of the lot by Daniel Coffrin to one Samuel R. Hooper, at a sale of non-resident lands held on the 9th of September, 1851, which sale, owing to certain omissions, was admitted to be invalid ; but the plaintiff claimed it gave color of title to the lot. The plaintiff then put in a collector's deed of the lot from said Coffrin to said Hooper, dated March 8th, 1853, and duly recorded. The plaintiff then introduced testimony tending to prove that the said Hooper, in the fall of 1851, entered on said lot under a claim of title, and cut five spruce trees for shingle timber, for the purpose of taking possession of the lot ; that after the time of redemption expired, but before he got his deed, in the fall and winter of 1852–3, he cut about seven hundred spruce and hemlock logs on the southerly side of the lot, and got a portion onto Groton pond on the lot, and a portion into a saw-mill called Ricker's mill, near the corner of the lot ; that the lot lay about fifty-seven rods from said Hooper's home farm, and was handy as a timber lot ; that in the same years they made shingle on the lot, and drew shingle timber from the lot ; that in the winter of 1853–4, they lumbered on the south side of the lot, cut twelve to twenty trees, and when the snow became deep, went into the center of the lot and cut as many more trees, and drew the logs onto the pond, and drew home shingle timber ; that about 1854–5–6, they tapped about a hundred and fifty trees on the lot for three seasons, and drew the sap to said Hooper's house, and boiled it there ; that they continued to cut shingle timber and other timber on the lot, as they wanted, up to 1857 ; that in 1857, the said Hooper gave a license to McLane Marshall to go on to the lot near the south-east corner, and erect a hotel and other buildings, and that the said Marshall did go on and erect said buildings, and occupied about an acre, and claimed to be in the actual occupation of

about three acres ; and by himself and tenants, occupied said tract of about three acres until June 6, 1866, when he sold the same to one Sylvester Charters for $1600, and gave him a warrantee deed thereof; that in July, 1859, the said Hooper conveyed said lot to his daughter, Sarah Hooper, reserving the right of Marshall to occupy his portion of the lot as long as he kept a hotel on the premises ; that about 1866, the defendants severally attached the premises occupied by Marshall, on claims against him, and procured judgments, and levied their executions on said premises, and after the time of redemption expired, went into possession thereof, under the title of said Marshall, and continued in possession of said hotel property up to the 23d of January, 1869, when they got their deed under which they now claim to hold the premises ; that the said Sarah Hooper died in July, 1864, and the plaintiff was appointed her administrator December 5, 1865 ; that the plaintiff, as administrator, in February, 1866, commenced suit in chancery against these defendants and others, to recover the land thus claimed by the defendants under Marshall ; that such proceedings were had therein, that at the March term of the court of chancery in Washington county, 1869, the plaintiff recovered a final decree, dated the 30th day of April, 1869, giving him the land and the defendants the buildings, if they removed them in one year, otherwise they were the property of the plaintiff. The material parts of this decree are stated in the opinion. That said Hooper, after the deed to his daughter, managed the land the same as before, and had since her death and the appointment of her administrator ; that they cut shingle timber and sugared on the lot in 1859 or 1860, and again in 1871, and had used that part not occupied by Marshall, as a man would use a wild lot connected with his farm, without any interruption by any person, unless the acts of one Christopher Richardson, as hereinafter set forth, worked an interruption of the possession ; all which acts of said Hooper, and of those under him, were done under a claim of right, as owners of the lot.

The defendants, in support of the issue on their part, offered

the copy of the charter of the town, showing that Roswell An-
drus was one of the original grantees therein ; also, the proprie-
tors' records, showing that the lot in question was drawn to the
right of said Andrus.  They then offered, subject to such objec-
tion as might be pointed out, various records of sales of the
lot for taxes.  When objections were pointed out, the defendants
admitted these sales were void for informality therein ; and, as no
offer was made to show that any one acted on the lot under the
title, till after the Taisey sale in 1833, these sales, except the
·Taisey sale, were treated by the court as of no account.  The de-
fendants then offered the proceedings of the tax sale of John Tai-
sey, of June 13, 1833.  They offered the original proceedings and
tax-bill, &c., found among the papers of said Taisey, deceased,
and proved the signature of Taisey, and of the several others
signing the same.  They also showed the same proceedings from
the town records, except in one or two variations, in which it was
manifest the town clerk had made a mistake in recording.   To
which the plaintiff objected, and claimed the following defects :

1st.   " There was no legal proof that the collector was sworn.
2d.   " There was no legal proof that the old book produced,
found in Taisey's old papers, was a valid document, or its con-
tents could be used.
3d.   " The committee's advertisement did not name the town
where the legislature sat when the act was passed.
4th.  " There is no proof of a tax-bill.
5th.  " The return of sale was not signed.
6th.  " There is no proper certificate of the committee's and
collector's advertisement on record.
7th.  " The papers were not duly recorded.
8th.  " And for other defects on the face of the papers, appa-
rent of record."

The certificate, which immediately followed the record of the
committee's advertisement, certified,

" That the above is a true copy of the original advertisement,
as published in [giving the names, volumes, numbers, and dates
of the several newspapers] ; which nine newspapers, each con-
taining an advertisement of which the above is a copy, have, this·
13th day of June, 1833, been presented to me at my office, by

John Taisey, the collector, for record, and have been severally examined and carefully compared with the above copy, by me,

"JOHN DARLING, Jr., Town Clerk."

"Rec'd on record,June 14, 1833.

"Attest, JOHN DARLING, Jr., Town Clerk."

The same certificate, *mutatis mutandis*, followed the record of the collector's advertisement. All the other facts material to an understanding of the questions raised, are stated in the opinion. The court overruled the objections, and told the jury, for the purposes of the trial, they would hold that this sale conveyed a valid title to George S. Mason, the purchaser at the sale. To this ruling the plaintiff excepted.

The plaintiff, prior to the December term of court, had taken the deposition of one Charles H. Carpenter, of Chichester, N. H., and had filed the same in court ; and on trial, had the deposition in his possession in court, with the knowledge of the defendants. The defendants called on the plaintiff to produce it. The plaintiff claimed the defendants had agreed to pay him the expense of taking the deposition, before they used it, and objected to their having the deposition, unless they paid as agreed, which they refused to do. The deposition had never been used in court. The court ordered the plaintiff to produce the deposition for the defendants to use ; which he did. The court made no order as to who should pay for taking the deposition, but held that it having been filed in the cause, neither party had the right to withdraw it, and either party had the right to use it. To this ruling the plaintiff excepted.

The defendant then introduced testimony tending to prove, that prior to 1836, the said Mason conveyed said lot to one Jacob Perkins, of Chichester, N. H., but that said deed was never recorded ; that at some time prior to or in the fall of 1836, said Perkins told one Leverett Page, of Groton, that he might have the lot for $25, and that he was to pay the taxes on said lot, and look after it, and when he paid the $25 he should have a deed of the same; that under that agreement, in the fall of 1836, said Page made 4000 or 5000 shingle on the lot, and sold 10,000 feet of hemlock lumber, and that Page drew off some shingle timber from the lot ;

that Page died in 1837, and that Samuel Page, his son, with the consent of the family and administrator, continued to cut timber on the lot up to 1841, when, in January of that year, he went to New Hampshire and agreed with said Perkins that he would take the land on the same terms his father was to have it; that he went on to said lot and took off all the rift timber and some logs, while he lived in town, and used it as his own for a timber lot in connection with his farm; that he left town for Newbury in January, 1848; and he testified that he did not cut any timber on the lot for the last year or two he lived in town; he would not swear he was on the lot for three years before he left town; and there was no proof from any one that had a tendency to prove that he ever did anything more on the lot, except he testified that he was occasionally upon the lot when he was at the pond fishing, after he moved to Newbury. This witness also testified that he paid taxes on the lot after he moved to Newbury, and that he inquired after the lot of the neighbors, to see if any one was cutting timber on it, and that he continued this care and oversight of the lot till after he learned of Coffrin's sale, and that the time of redemption had expired, and that he did not learn of the sale till after the time of redemption had expired; that he paid the taxes up to and for the year 1847; that after he left town in 1847 or 1848, he never went back to do any work on the lot, or to look after it; that during said time the lot was set in the grand list, part of the time to Roswell Andrus, Page, and Jacob Perkins, and part of the time to Jacob Perkins; that it was never set in the list to either Leverett or Samuel Page, and neither Leverett Page nor Samuel Page nor Jacob Perkins ever had any record title to the lot on the records in Groton, and no allusion was made to the title of said Mason by the occupants of the lot, except as Perkins's title was connected with Mason's title; and there was no evidence that any of the occupants of the land ever named Mason's name in connection with the land, but called it the Perkins or Carpenter lot. The evidence further showed that the lot was sold by Coffrin for the taxes for the years 1848–49–50.

The testimony further tended to show, that in 1850, before the Coffrin sale, Jacob Perkins went to Samuel Page's house in New-

bury, and while there Page called on him to deed the land and take his pay for it, or pay him for the taxes he had paid, and his trouble taking care of the lot, and Perkins said he would deed. The evidence showed that Samuel Page had paid all the taxes up to those included in Coffrin's sale, and plaintiff claimed they did not all amount to one dollar; but the evidence tended to show he had paid more taxes than that amount; that he had sold off $5 or $6 worth of lumber, and had taken off timber sufficient to make about twenty thousand long shingle, equal to about eighty thousand short shingle, and had also made some short shingle, and taken off logs to make 20,000 feet of boards. Page's testimony tended to show that Perkins understood he was to cut timber on the lot, and take it off as he wanted to. After Perkins told Page he would deed him the land, they went to bed, and Perkins got up in the morning before Page did, and left town, and Page never saw him or wrote him after that. Perkins died in 1856. From the time Perkins left Page's in 1850, Page never went near the land, paid no taxes on it, and never looked after it, or paid any attention to it, except as heretofore stated. Jacob Perkins willed his property to Carpenter, but the will was never proved in Vermont.

The evidence further tended to prove, that in 1864 or 1865, one Christopher Richardson went to Samuel Page, and informed him that the Coffrin sale was invalid, and made a contract with him to give him $30 for his interest in the lot, and that he agreed to assist Richardson to get the land as cheap as he could of Carpenter; that Page, up to that time, had never seen Carpenter, or corresponded with him, but always claimed he had an interest in the lot by his arrangement with Perkins, if Coffrin's sale was not valid; that under this agreement, Richardson, in May, 1865, went on to that portion of the lot not occupied by those claiming under Marshall, where some persons were cutting a canal across a small piece of land, and told them they might cut it deeper and wider, and they did so, and he then claimed the lot as his own. He also told some men who were putting a boom on the pond, that they might put it there, but he should charge them something for it. That in June, he cut down about three-fourths of an acre

of bushes, timber, and wood on the lot, which was after the death of Sarah Hooper ; and that Samuel R. Hooper sent two men to order him off, but he worked two days longer, and left, and had never been on to the lot to do anything since, except the testimony tended to prove that he went once when one Thomas Goodwin was making shingles in the bowling alley on the premises occupied by those under Marshall, and told Goodwin that he might make shingle there, but he should charge him for it; but he was never paid anything for it, and Goodwin never agreed to pay anything.

The defendants further offered testimony tending to prove, that a portion of the Lake House was on the lot of A. H. Ricker, and that Ricker and Leverett H. Page, who occupied the lot under Charters, agreed that Page might occupy a portion of said Ricker's land, as long as he would supply Ricker's house, with water ; and that in pursuance of said contract, they went to work to dig a ditch and lay the logs; that while they were doing it, Richardson was there, and said to them : " If you have any water to spare, I have no objection to your carrying it to him." Richardson did not testify that he ever gave notice to Charters, the owner of the property, or to his tenant, L. H. Page, to remove, ever demanded possession, or in any manner interfered with them. He testified : " I went on the lot, and Leverett H. Page in the house. This was May or June, 1865. I took possession by notifying the people on it I had bargained for it. Notified Leverett H. Page." He then detailed his several acts of possession on the lot, as herein before and hereafter detailed.

The piece of bushes cut by Richardson, did not exceed three-fourths of an acre. The testimony tended to show that about the time of the cutting of the slash, one Annis agreed to burn it when it got dry, and did set it on fire, but it burned but a portion of it, and it has never been touched since. Richardson's testimony further tended to show, that he went to Chichester, N. H., and made a bargain with said Carpenter for said lot, with the assistance of said Samuel Page, by which he was to pay Carpenter $100, and Page $30, and that a deed and notes were made out and left at Wells River Bank, but the notes were never paid,

nor deed delivered, and that he redeemed the land from a tax sale by paying $5 or $6. Said Richardson, though often at the Lake House, never interfered with the lot since the plaintiff was appointed administrator.

The plaintiff introduced the testimony of several witnesses, to prove that said Richardson entered on the lot, and claimed that he was cutting the timber under the title of the Harris heirs, and not under the title of Page or Carpenter; and proved by one Jacob Hooper that he told him while chopping, that he was cutting the timber to take possession of the lot under the title of the Harris heirs, as their agent. The plaintiff produced other witnesses to whom Richardson had made similar declarations. The plaintiff then offered himself as a witness, and testified in substance as follows: "On the 22d of February, 1866, I was at the Lake House on lot No. 70, in Groton, being the lot in dispute, with the officer who went to serve the bill in chancery against the defendants and Leverett H. Page and others, in relation to this lot. Christopher Richardson was at the Lake House, and examined the copy delivered Leverett H. Page—Page was living in the Lake House, and a copy was served on him. Richardson examined the copy, and told me he claimed to own the lot. I asked him by what title he claimed to own the lot, as I wished to know his title before I made further costs. He told me he claimed it under the title of the Harris heirs; asked me to go the door of the Lake House, and showed me the piece cut down. I asked him what he was going to do with it, and he said he was going to clear it and plant it. I then told him if all the title he had got was under the Harris heirs, if he went on to the land again to cut trees or clear the land, I would sue him, and I have never known of his doing anything there since."

This testimony the plaintiff claimed was evidence in chief of Richardson's claim to the land, and that if believed, it was conclusive of his claim, and would estop him, and others claiming under him, from setting up a different claim of title. But the court ruled, that these declarations, made after the chopping and on the lot, and when the plaintiff and Richardson stood in full view of the piece cut down, and not over one hundred and fifty

feet therefrom, were no evidence in chief, but could only be used to impeach the witness, and detract from the weight of his testimony. To this ruling the plaintiff excepted.

On cross-examination, Richardson was inquired of if he did not make the cutting on the lot under the title of the Harris heirs, and had not claimed to people in Groton, that he claimed the lot and made his cutting under the title of the Harris heirs, which he denied. He was then inquired of if he had not claimed to be the agent of the Harris heirs as to other lots in Groton, and if he had not offered to sell other lots in Groton under the title of the Harris heirs; to which he replied, that he never had any agency for the Harris heirs in the town of Groton; that he never claimed any land in Groton under the Harris heirs; and never offered to to sell any to any one under that title. He was then inquired of if he did not offer on a certain day about four or five years before, at Groton, to sell to one G. W. Goodwin, lot No. 5 in Groton, under the title of the Harris heirs, and tell him the deed was coming from the Harris heirs,—which he denied. The plaintiff then offered the said Goodwin to prove that he did buy said lot of Richardson, and that Richardson represented that he was the agent for the Harris heirs, and that they owned the lot. To the admission of this testimony the defendants objected, and it was excluded by the court; to which the plaintiff excepted.

There was no proof tending to show that said Carpenter ever had any knowledge of this cutting by Richardson, or ever consented to the same. The only evidence in relation to any negotiation or trade between Carpenter and Richardson, was as follows: Richardson and Page, prior to January, 1866, had written Carpenter about purchasing this lot, and Carpenter came to Wells River to meet Richardson, in January, 1866, but Richardson not getting the letter, they did not meet. In June, 1867, Richardson went to Chichester to see Carpenter, and all that took place between them was, Carpenter agreed to deed Richardson the land, and Richardson was to give his note to him for $100, and one to Page for $30, and the notes and deed were to be sent to the Wells River Bank, and when Richardson paid the notes, the deed was to be delivered to him. There was no proof that Car-

penter or Mason ever knew of, authorized, or consented to, the act of Richardton in entering on the lot; except that Richardson claimed to have done said acts under his arrangement with Samuel Page for the purchase of said lot; and Carpenter recognized said Page's claim to some interest on the lot, by allowing a part of the consideration of the sale to the defendants to be paid to Page. The testimony further showed, that said deed and notes were left in the bank for two years, and that Richardson was called on for pay on the notes, and refused; and that Carpenter then withdrew his notes and deed, and, at the request of Samuel Page, procured said Mason to deed the land to the defendants, who paid about $175, and Page paid Carpenter $100 of this sum, and retained the balance for aiding in the business, and his claim for taxes and trouble. There was no proof that Samuel Page ever tendered any pay for the lot. The defendants, at the time they took their deed, were in possession under the Marshall interest or title, and they had their title before the final hearing in said chancery suit.

There was no proof tending to show that they had ever done any acts of possession on the lot since they took their deed, outside of the three acres they had a right to occupy by the decree in chancery; but the defendants, at the request of the plaintiff, before he rested his case, admitted they were in possession of the whole lot, both at the time of bringing the suit, and at the time of the trial. There was no testimony tending to prove that Perkins, who died in 1856, or Carpenter after his death, ever inquired after or claimed title to the lot, excepting Carpenter's agreeing to quit claim to Richardson or to the defendants for $100. The premises were admitted to be of the value of $3000 with a clear title, and perhaps $4000.

The evidence tended to show that Richardson still claimed to own the lot in his right under the deed from Carpenter; and he testified that he still claimed the lot, and that he had never in any manner yielded or assigned his right under his possession, to Page or Carpenter, or the defendants. The defendants' testimony tended to show that they were to have the benefit of Rich-

ardson's acts of possession, by an arrangement between them and Richardson. Richardson's testimony also tended to show, that all his acts of possession were done under the Mason, Perkins, or Carpenter title, the title which the defendants now own.

The plaintiff requested the court to charge the jury as follows:

"1st. The grantor of the plaintiff's intestate having bid off the lot in question in 1851, if the jury find he entered on the land and cut the timber in the fall of that year, under a claim of right, this gave a possession to the whole lot, which, being followed by a deed from the collector, dated March 8, 1853, gave a constructive possession to the whole lot to the plaintiff's grantor, and the statute of limitations would begin to run from the entry in the fall of 1851; and, as over eighteen years had elapsed from the entry of the plaintiff's grantor, to the time the defendants took their deed, if not interrupted by the entry of Richardson, the title had become absolute in the intestate's estate, if her grantor had no legal title to the lot.

"2d. That McLane Marshall having entered on a portion of the lot and erected buildings thereon under the title of S. R. Hooper, the actual possession of a portion by Marshall, was a possession by Hooper, and inured to the plaintiff's title as to the whole lot, and aided in extending the constructive possession of the plaintiff's grantor to the whole lot.

"3d. If the jury find that Samuel Page made some contract with Jacob Perkins for the lot in 1841, and he cut timber on the same up to the spring of 1845, and paid the taxes to 1847, if Perkins had no record title to the lot, and they find that Page moved from the town in 1847, or winter of 1848. and that he has never done any acts of ownership on the land since the spring of 1845, and that he has never paid the taxes on said lot since 1847, and that Perkins came to his (the said Page's) house in Newbury in 1850, before the land sale, and that Page told Perkins he wanted his pay for the taxes he had paid, and for his trouble, or he wanted a deed, and he would pay for the land, and that Perkins told him he would deed; if Perkins left the next morning before Page was up, and neither said Page or Perkins, nor any one under them, for fifteen years, entered upon the premises under the title of Perkins, it would be an abandonment of the lands, and all rights acquired by possession would be abandoned.

"4th. If the contract of purchase of Samuel Page was by parol, and Jacob Perkins had deceased, Samuel Page would have no right to go on to the lot himself, and take possession of the

premises; and he could not authorize Christopher Richardson to enter on the lot, and have his acts support the title of Perkins.

" 5th. That as Richardson swears that he cut the timber under a license from Page, and before any contract with Carpenter, and that he still claims the lot under the deed from Carpenter, and has never given up or surrendered his deed or claim to Page, Carpenter, or the defendants, his acts cannot inure to the title of the defendants under the deed from Mason.

" 6th. If Richardson entered on the lot in 1865, by authority of the legal owner who had no deed on record, and the jury find that Samuel R. Hooper entered on the lot in the fall of 1851, and put his deed on record in the spring of 1853, and he and those claiming under him had been in adverse possession of the lot for over thirteen years, doing such acts on the lot as cutting timber, making shingle, and erecting buildings thereon, and occupying the same, if Richardson cut down a few trees near the buildings, this would not give him constructive possession beyond his actual cutting and possession, and it is a question for the jury whether it would interrupt the possession to that extent. It could not be extended by construction to the whole lot.

" 7th. If Richardson entered and cut the trees as mentioned in the last request; if he was ordered off by Hooper, and ordered by the plaintiff not to clear the land, and he left it, and it has grown up again to bushes, it was an abandonment of the premises, and his act was simply an act of trespass, that can have no effect on the title to interrupt the running of the statute.

" 8th. If Hooper entered on the lot in 1851, as the evidence tends to prove, and in 1857 or 1858, McLane Marshall, under Hooper, entered and erected buildings, and was in the actual possession of a portion of said lot, and was living on said lot under said Hooper, the entry of Richardson on other lands outside of the lands in the actual occupation of said Marshall and those claiming under him, would have no effect to stop the running of the statute as to the lands in the actual occupation of those claiming adverse to the defendants' title. By the decree in chancery the plaintiff has the title of the land occupied by McLane Marshall and those claiming under him; and as Hooper entered in the fall of 1851, and the defendants did not get their deed till Januaay 23, 1869, there was a continuous, uninterrupted, actual possession of that portion of the premises for over eighteen years, without any interruption, and the title to this portion of the premises became absolute in the plaintiff as administrator, by over fifteen years possession.

" 9th. That if the contract was made between Richardson and

Carpenter. as set forth in Carpenter's deposition, it gave Richardson no right to go on to the lot and cut timber until he paid the notes.

"10th. That the contract made between Richardson and Carpenter in 1867, had no relation back to June, 1865, and does not sanction any act of cutting by Richardson in 1865.

"11th. A stranger cannot do acts of ownership or possession on land, to aid the title of the true owner," without the prior request of the owner, or his subsequent assent thereto; and there is no pretence that this cutting by. Richardson ever came to the knowledge of Carpenter or Mason, or was ever approved by them. It was no claim of title or acts of possession by them.·

"12th. That if the jury find that George S. Mason deeded this lot to Jacob Perkins in his lifetime, if the deed is not recorded, the title passed by the deed to the estate of Perkins, and left no title in George S. Mason to convey to the defendants. That deed therefore conveyed no legal title to the lot. The most it would give would be color of title. It is of no greater validity than Hooper's deed from the collector.

"13th. The plaintiff, as administrator, being in the adverse possession of the premises at the time of the deed to the defendants, the deed to the defendants is void by the statute.

"14th. As the defendants went into possession under a levy against McLane Marshall under Hooper's title, and as the court decreed, as against them, the .land to the plaintiff, and the buildings if not taken off in one year, they are estopped from setting up any claim to the same under any title they may buy in during the litigation, and hold prior to the trial in the suit in chancery.

"15th. The facts being undisputed that S. R. Hooper, the intestate's grantor, entered into possession of the lot in the fall of 1851, after he purchased the property at the land sale, under a claim of title, and under such claim of title from year to year up to the time that McLane Marshall went into possession of a portion of the lot, did acts of ownership on the lot, such as cutting timber, making shingle, and sugaring on the lot; and that in 1857 McLane Marshall, under Hooper, entered into actual possession of a portion of the lot, and erected buildings thereon—the entry of Richardson on another portion of the lot not in the actual possession of Marshall, or those claiming under him, could not, as matter of law, stop the running of the statute as to the land occupied by Marshall under a title adverse to the title claimed by Richardson; and that as there was no interruption as to the possession of the lands in the actual possession of those claiming

under Marshall, from 1851 to January, 1869, when the defendants took their deed, a period of over eighteen years, the court should direct a verdict for the plaintiff for that portion of the premises, as he has acquired the rights of those claiming under Marshall by the decree in chancery."

\*    \*    \*    \*    \*    \*    o

The court charged the jury, in substance, that in order for the plaintiff to recover, it was incumbent on him to show that, as against the defendants, he had the right to the possession of the lot, or to the Marshall portion of it, at the time he brought the suit, and at the time of the trial; that the defendants admitted they were in the possession of the whole lot at both of these times; that the plaintiff did not claim he had any record title, but claimed he had a title commencing in the sale and deed from Daniel Coffrin to Samuel R. Hooper, by his acts of possession done under that title, though he admitted the sale and deed, of themselves, to be invalid, by reason of the failure of Coffrin to comply with the statute in making the sale; that the defendants had introduced various deeds of the lot, and sales of the lot for taxes; that the deeds commenced with that of Nehemiah Lovewell to Ephraim Webster, in 1789, and continued down to George S. Mason, and claimed that the court ought to presume a conveyance from the original proprietor, Roswell Andrus, to said Lovewell, or to submit that question to the jury; but as no acts of possession were shown under any of the conveyances or sales, the court did not find any evidence on which to submit that question to the jury, and no evidence of title in the defendants' grantors, till they came to the sale of John Taisey, and his deed as collector, dated January 13, 1834; that for the purposes of the trial, the court held that that sale was made in conformity with the statute then in force, and was valid, and that said Taisey's deed conveyed a valid title to the lot to said Mason; but that, as the plaintiff had raised objections to that sale, and claimed it was invalid, and the court might be mistaken in holding that sale valid, and as the defendants had introduced evidence tending to show that the owners under that deed and title, took possession of the lot under the sale and deed, the court desired the jury in the first

place, to examine and determine whether, if the deed should be held invalid, the defendants had established by a fair balance of testimony, that George S. Mason and his grantees, and those acting under that title, had acquired title to the lot by fifteen years adverse possession. That in order to acquire title by adverse possession as against the true owner, George S. Mason and those in that chain of title, by themselves and their servants, or those acting under them, must have occupied the lot for fifteen consecutive years, openly, notoriously, continuously, and adversely to the person having the record title ; that if Leverett Page made such an arrangement as the testimony tended to show, with Perkins, while he was the owner of the Mason title, and entered upon the lot under that title, claiming title to it, and did an act of possession, that act would, constructively, from the fact that the Mason deed was on record, extend to the whole lot, and put those claiming under that title, in constructive possession of the whole lot ; that in order for an act done on the lot to be an act of possession, it must be such an act that if the true owner should go upon the lot and make such an examination of the lot as a man of reasonable care and prudence, owning the lot, would be likely to make, he would find the act, and it would indicate to him that some one had been upon the lot, doing an act of possession under some claim of ownership or of a right to do the act ; and that such acts must have been done with such frequency, and so continued throughout fifteen consecutive years, that if at any time during the fifteen years, the true owner of the lot had gone upon the lot and made such examination, he would have found sufficient evidence of the acts remaining on the lot, to convince a man of ordinary care and prudence that the doer of the acts was in possession, claiming the right to do the acts, and claiming the lot ; that the acts must be open and notorious in this way or sense, and adverse, or so injurious to the interest of the true owner as would call his attention to them, and would put him upon inquiry as to who committed them. The court told the jury that, in order to be an act of possession, it must be more than a mere act of trespass, or such an act as would indicate to the true owner, in the exercise of reasonable care and prudence, if it came to his know-

ledge, that the doer of the act simply intended to infringe upon his right, and not to assert any right or title to the land in the doer ; that the payment of taxes by a person in possession, was not an act adverse to the true owner, because not injurious to him, but was evidence tending to show that the person in possession and paying taxes, was claiming to own the lot, or claiming title to it. The court further told the jury that the acts of Samuel Page, done after his father's decease, and before he made an arrangement with Perkins to purchase the lot himself, could not be considered in this connection, unless they were done with the approval of the heirs and administrator of his father; and under the right which his father, Leverett Page, had under his arrangement with said Perkins for the purchase of the lot ; or were done under the Perkins title, subsequently acquiesced in by Perkins, at the time he entered into an arrangement with said Samuel Page for the sale of the lot to him. The court told the jury it was not necessary for the person to be in actual personal possession of the lot all the time during the fifteen consecutive years ; but he should do acts of possession so frequently, that at all times there would be evidence of his being in possession of the lot, as before explained.

The court directed the jury to determine the time when the first act of such possession was done, if at all, and how long such possession was continued uninterruptedly by those acting and claiming under the Perkins title ; and if said time of such uninterrupted possession amounted to fifteen years, those having the Perkins or Mason title would acquire title to the lot. The court told the jury that Leverett Page or Samuel Page, under that title, might commence an adverse possession, and voluntarily abandon it at any time before such adverse possession ripened into a valid title by fifteen consecutive years of such uninterrupted possession ; and if Leverett Page, or those who represented his estate, or Samuel Page, did, voluntarily, abandon all possession and claim to the lot under the Perkins title, before the expiration of the fifteen consecutive years, that would be an end of all their possession prior to the abandonment ; that although the deed from Mason to Perkins would, though unrecorded, convey the title of the

lot to Perkins, and the same would descend to Carpenter by Per-
kins's will, yet, if Carpenter received the defendants' money, and
obtained a deed from Mason to the defendants, rather than place
Mason's deed to Perkins on record, and proceed and settle Per-
kins's estate in this state, and convey the lot to the defendants,
Carpenter would probably be estopped from asserting the title in
himself, through the will of Perkins ; that at least the defendants
stood in such relation to the lot, being in possession, that they
could justify under their deed from Mason ; and if the Mason,
Perkins, or Carpenter title, whichever it might be called, was
valid, either by reason of the Taisey sale and deed, or by reason
of those acting under that title having acquired title to the lot by
adverse possession in the manner explained, the defendants could
hold the lot against the plaintiff, unless the plaintiff and those
under whom his intestate claimed, had acquired title to the lot by
adverse possession, subsequently to the Mason, Perkins, or Car-
penter title having become valid.

The court then instructed the jury to inquire and determine in
the manner it had already explained to and instructed them, whether
the plaintiff's intestate and her grantor had acquired title to the
lot by adverse possession, with the following additional instruc-
tions : that the acts done by Samuel R. Hooper on the lot, prior
to his having obtained his deed from Coffrin and placed the same
on record, if acts of possession, would not necessarily extend to
the whole lot ; and that although Hooper intended by them to
take possession of the whole lot, under his incohate purchase from
Coffrin, yet they would not extend to any more of the lot than they
would indicate to the true owner of the lot, if he knew of the acts,
that Hooper had fairly taken possession, and intended to take pos-
session of; and that it was for the jury to determine from the evi-
dence, whether by these acts said Hooper took possession of any,
and if so of how much and what parts, of said lot, whether the
whole lot or less ; but that after said Hooper placed his deed from
Coffrin on record, his acts of possession under said deed would
extend to the whole lot, and that the plaintiff's intestate could
avail herself of the acts of Marshall and his grantees and lessees,
done under his title and on the lot.    The court directed the jury

to determine when the said Samuel R. Hooper's possession of the three acres, and of the whole lot, commenced, and how long it continued uninterruptedly to said three acres, and how long to the whole lot.

The court further told the jury, that the acts of Richardson, if done under a claim of title in the Harris heirs, would be no interruption of those in possession under the Hooper title, derived from the Coffrin deed and the acts of Hooper and grantees under it, inasmuch as by Marshall, and his grantees and lessees, there was some one in actual possession of part of the lot under the Hooper title, at the time the acts were done. But if Richardson did said acts under the Mason title, it would be different; that where the person having the title did an act of possession, and went into possession of land then in the possession of one who had no title, but was claiming title, and holding adversely to the true owner, and there was a joint possession in the two, the seisin followed the possession of the true owner, and his act of possession inured to his benefit, and interrupted the possession of the one who had no title, and was not the true owner; that if Richardson entered upon the lot and cut down one-half or three-fourths of an acre of brush, wood, and timber, and did other acts, such as his testimony tended to show, under the Mason or Perkins title, under an arrangement with Samuel Page, such as his testimony tended to show, although it was done without any special authority from Carpenter, who then owned the Mason title, and without Carpenter's knowledge, yet if Carpenter subsequently assented to and ratified these acts, by recognizing Page's rights and interest in the lot, and by paying him for his care and trouble about the lot, and for his interest in it,—the cutting of the one half or three-fourths of an acre would be an interruption of the plaintiff's intestate, to all of said lot except what was occupied by those acting under Marshall; and if Richardson did said acts as acts of possession of the whole lot, and gave those in possession under Marshall to understand, and they did understand, that he did said acts as acts of possession of the whole lot, and that he did them to take possession of the whole lot under the Mason or Perkins title,

then his acts would work an interruption of Marshall and those holding under him, as to that portion of the lot occupied by them, as well as to that portion of the lot occupied by the intestate; and under said instruction the court submitted to the jury to find whether said Richardson's acts were done under the Mason or Perkins title, and if so, whether they were an interruption of that portion of the lot occupied by Marshall and his grantees or lessees, or only to that portion of the lot in the possession of the intestate; and under said instructions, with its previous instructions in regard to adverse possession, the court submitted to the jury to find whether the plaintiff had acquired title to said lot, or to that portion occupied by Marshall, by fifteen consecutive years uninterrupted, adverse possession, and if so, that the plaintiff would be entitled to recover for such portion of the lot as he showed title to. The court further instructed the jury, that if they should find that neither party had acquired title to the lot by adverse possession, as the court might be mistaken about Mason's title under the Taisey deed being good, it desired the jury to find whether the defendants, and those under whom they claimed, had ever abandoned their possession of the lot had prior to the possession of the plaintiff's intestate's grantors, and that the defendants in possession could stand upon the prior possession of the lot by those under whom the defendants claimed, unless that possession and claim to the lot had been abandoned and voluntarily given up by those under whom the defendants claimed; that if it had been so abandoned and given up, the defendants could not stand upon the prior possession of their grantors under the Pages, as against the plaintiff's intestate's later possession, and the possession of those under whom she claimed. The court submitted special findings to the jury, which were returned with their general verdict. The jury, after having considered the case for a time, came into court and desired the court to repeat some portions of its instruction in regard to the adverse possession and title thereunder of the defendants, and in regard to an interruption of plaintiff's possession by Richardson. The court, repeated substantially, its instruction on those points. The foreman then requested the court to reduce its instructions on those points then given to writing. The court told

them it could not do so without the consent of the parties. The counsel on both sides desired the court to comply with said request, and the court did so, as follows.:

" In answer to written request No. 1, the court say that it is not absolutely necessary that you should find in regard to the special issues submitted by the court ; but it is important that you do so, for the reason, if the court should be mistaken in its holding that the defendants obtained a good title to the lot through the Taisey deed, it would be no error, if the defendants or their grantors had acquired a good title by adverse possession for fifteen continuous years, of the character and in the manner the court explained in their charge. Hence, it becomes important for you to determine whether the defendants or their grantors had acquired title to the lot by adverse possession, if the Taisey deed is treated as void, and the defendants are to stand for their title upon their adverse possession alone, that is, their possession adverse to the true owners or holders of the title, the defendants for this purpose not being regarded the true owners and holders of the title. So, too, the court may have erred in its charge to the jury in other respects, and your determination of the other two special issues submitted by the court, may result in a final disposition of the case in the supreme court, if the case should go there, and otherwise it might have to be sent back for a re-trial in this court.

" In regard to the third inquiry submitted by your foreman, the court say that they do not well see how you can determine under what title Richardson acted, excepting from what he has testified he acted under, and from what he said at the time he was doing the acts. The court told you in its charge, if Richardson, in what he did in taking possession of the lot, took possession under the Harris heirs, and so claimed at the time, the defendants cannot avail themselves of his acts as an interruption. In determining this fact, you are to consider the testimony of Richardson, the testimony of the other witnesses as to what he said at the time he was doing the acts, the testimony of other witnesses in regard to his knowledge of the Mason title or title represented by Page, and in regard to the title of the Harris heirs. The testimony of Jacob Hooper that Richardson claimed to him, when on the land making the cutting, that he was acting under the Harris heirs, if you believe he did so claim to said Hooper, would tend to show, and can be considered by you as tending to establish, that he was acting and professing to act under the Harris heirs. The testimony of Mr. Wing, Lebbeus Welch, and Daniel Coffrin, in regard to Richardson's statements to them to the same effect, if you find

he made them as they testify, cannot be considered as tending to establish that fact for the plaintiff, but only to impeach the testimony of Richardson, or detract from his credibility as a witness. To find that Richardson's acts were an interruption of the plaintiff's adverse possession, you must find he took possession, and did his acts of possession, under the title the defendants claim under, and that he did not then claim to the contrary to those in possession, and who had a right to know under what title he claimed to act. How this fact is, you are to determine from all the evidence in the case, and from all the circumstances and probabilities, and not alone from the evidence I have mentioned. And it is for the defendants to satisfy you that the fact is as they claim it, rather than as the plaintiff claims it, in order for you to find this fact affirmatively, or that his acts were an interruption. This is a repetition of the substance of my charge on this point, as well as what I said to you in answer to your inquiry No. 3."

The plaintiff excepted to these written instructions. The court instructed the jury in regard to damages, in a manner not excepted to by the plaintiff, and explained and illustrated the several propositions contained in the charge, to enable the jury better to understand them. The court did not otherwise comply with the plaintiff's requests. To the failure to charge as requested, and to the charge as given, so far as it varies from the requests, the plaintiff excepted.

The jury found by special verdict, that the defendants' grantors had acquired title to the lot in question by adverse possession, prior to the commencement of the adverse possession of the plaintiff's grantors; that the defendants' grantors had not abandoned their adverse possession prior to the acts of Richardson or these defendants; and that the acts of Richardson were an interruption of the adverse possession of the plaintiff's grantor to the whole lot.

The plaintiff *pro se*, with whom was *Ossian Ray*.

The plaintiff showed a deed from S. R. Hooper to the plaintiff's intestate, and possession under that title, and showed for more than fifteen years a clear, uninterrupted possession which ripened into a perfect title, unless interrupted by the acts of Richardson.

The court erred in ordering the plaintiff to produce the deposition of Charles H. Carpenter.

The court erred in not charging the jury according to the plaintiff's first request. As this was a lot with well-known bounds, of which there is no dispute, the court erred in not telling the jury that the acts of Hooper before he took his deed, necessarily extended to the whole lot. *Hollister, admr.* v. *Young*, 42 Vt. 403. It is well settled in Vermont, that the entry on lands with known bounds, under a claim of right, gives constructive possession to the whole lot.

The ruling of the court in regard to the effect of Richardson's declarations as to the title he claimed under, was clearly erroneous, and directly opposed to the decisions in this state. *Webb* v. *Richardson*, 42 Vt. 465. The plaintiff further claimed that the court should charge the jury, that if they believed that Richardson, when inquired of by plaintiff as to his title to the lot, told him his claim as set forth in the plaintiff's testimony, it would estop the said Richardson, and all claiming under him, from claiming that he entered under any other title than the Harris heirs. But the court refused to so charge; but charged that it did not estop the defendants, and was no evidence even of the claim under which he entered and cut bushes on the premises. This was clearly error. This comes within all the definitions of an *estopped en pais.* *Halloran* v. *Whitcomb*, 43 Vt. 306.

The court also erred in rejecting the testimony of Goodwin.

Is it law, if a man is in possession of land with buildings upon it, that another, before the first has been there fifteen years, can go on, claiming to own the land himself, without color of title, and cut a small piece of bushes without the knowledge of the true owner, and then, if he can find the true owner within fifteen years thereafter, agree with him that he may have the benefit of these acts of possession, and thus have the chopping interrupt the running of the statute, and oust the first possessor, who may have had possession twenty-nine years, and the true owner never have known for twenty-nine years that any one had interfered with the tenant's possession, till the end of twenty-nine years from the first entry? The court, virtually, charged that to be the law. The court should have told the jury that the act should have been carried

to the knowledge of Carpenter, and he should have consented thereto within fifteen years from the time of the entry of Hooper.

But, if Richardson had been the lawful owner of the lot, and had perfect title to the same, then we insist that his acts, under the circumstances, would not interrupt the running of the statute. The charge, that if Richardson's title was good, his entry would stop the running of the statute as to the whole lot, including that part occupied by Marshall and his lessees, if Richardson so intended it, and so notified the people in possession, was error. That, having the title, his acts in cutting a few bushes gave him constructive possession to the whole lot, notwithstanding some of the lot was in possession of others, upon which portion he makes no actual entry, cannot be sustained. In this case, so far as the McLane Marshall part is concerned, there was no evidence to go to the jury, as to an interruption of the possession by Richardson.

If Richardson was the lawful owner of the lot, we insist his acts could not interrupt the running of the statute as to that part of the lot occupied by the lessees of Marshall; and the charge as to this portion of the lot, was clearly erroneous. *Kimball* v. *Ladd*, 42 Vt. 747.

The charge of the court, that if Richards. n entered by an agreement with Page, who had no record title, without the knowledge of Carpenter, his entry gave a constructive possession to the whole lot, is not sound law. *Admrs. of Dodge* v. *Wetmore et al.* Brayt. 92; *Lee* v. *Havens*, Brayt. 93; *Vaughn* v. *Barrett*, 5 Vt. 333; *Admr. of Bullock* v. *Rogers*, 16 Vt. 294; *Webb* v. *Richardson*, 42 Vt. 465; *Hughes* v. *Graves*, 39 Vt. 359.

The court erred in saying, that where the person having the title does an act of possession, and goes into possession of land then in possession of one who had no title, but was claiming title and holding adversely to the true owner, and there was a joint possession in the two, the seisin follows the possession of the true owner, and his acts of possession enured to his benefit, and interrupts the possession of the one who has no title, and was not the true owner. This cannot be law in the sense in which it is used by the judge in this case, and was directly calculated to mislead the jury. The constructive possession of the true owner can never ex-

tend into the actual adverse possession of the intruder on his lands, though the true owner is on the land, and, but for the acts and possession of the intruder, his possession would extend to the whole lot. *Jakeway* v. *Barrett*, 38 Vt. 316, 323; *Swift's admr.* v. *Gage*, 26 Vt. 224; *Stevens* v. *Hollister*, 18 Vt. 294. The constructive possession of the true owner cannot extend into the actual adverse possession of the occupant. *Stevens* v. *Hollister*, *supra*; *Crowell* v. *Bebee*, 10 Vt. 33; *Hubbard* v. *Austin*, 11 Vt. 129; *Ralph* v. *Bailey*, 11 Vt. 521. By the common law, the right of re-entry never extended to a case like the one at bar. If the tenant in possession, as in this case, died, it tolled the right of entry and drove the real owner to his action. The right of entry, by the common law never extended to a case where the tenant was in possession under color of title; and, clearly, never where the person who first entered had, while in possession, conveyed away the premises, and the grantee had been in peaceable possession under his deed, as in this case. At common law, the real owner could only enter where the intruder was in possession without color of title; that is, where he was a naked trespasser, without shadow of title. Then, as the occupant had only a possession without color of title, the entry of the real owner interrupted the possession. If the person who went first into possession, had assigned the lands by livery of seisin, part to one tenant and part to another tenant, the person who enters must enter on each one, for the entry on one is not sufficient as to the other. 3 Bl. Com. 175, *et seq.* The entry does not avail anything to stop the running of the statute of limitations, unless the party entering brings his action within one year from the entry. 3 Bl Com. 178.

If the defendants ask to stand on the common-law right of entry, as suspending the running of the statute, they must be governed by the common law, which does not suspend the right of entry where a descent is cast by the death of the tenant in possession, and, also, by the deed of the person who first enters, to the tenant in possession, which makes one more step towards a perfect title. Gen. Sts. § 3, p. 442. Therefore, if either Carpenter or Mason, or both together, had made the entry made by Richardson, it

could not have affected that part of the lot in possession of Marshall and his lessee, as no entry was made on that part. The verbal contract between Richardson and Page, while the land was held adversely, gave no authority to enter; and the entry was a trespass, and did not interfere with plaintiff's right in the land.

From the facts and authorities, the following propositions are fully established:

1.   That if Richardson had been the true owner, he would have had no right to enter; and if he had entered, he would have been a trespasser, and his entry would not have stopped the running of the statute of limitations.   By the death of Sarah Hooper in possession, at common law, the right of entry is taken away, and is not restored by our statute.   By the common law, the right of entry exists only when the tenant has a bare possession.   No case can be found where it has been upheld when the tenant was in under a deed or color of title.   If an alience comes into possession by a conveyance, it is more than a bare possession, and cannot be entered upon.   3 Bl. Com. 178, et seq.   If he had the right of entry, and did enter, he lost all benefit of the entry by not commencing his action of ejectment within one year after the entry.   2 Stark. Ev. 510; 3 Bl. Com. 176; 5 Phil. Ev. 269.   If he had been the true owner, and had a right of entry, and the entry stopped the running of the statute as to a portion of the lot, it could not have been any interruption as to that part in the actual possession of the lessees of Marshall.

2.   Richardson had no authority to enter, and his acts did not interrupt the running of the statute to any portion of the lot. Sale of the right of entry, is null at common law, and gives the purchaser no right of entry. It is void for all purposes. Hammond N. P. 214, referring to Co. Lit. ; Rawson v. Lewes, 63 N. C. 43. No entry by the owner, or any other person, can stop the running of the statute in Vermont, as the statute limits the action of ejectment and right of entry to fifteen years after the right of action or entry first accrues, and not after.   Gen. Sts. 442, §§ 1, 2.   Such are the English decisions, under a statute similar to our own.   *Napier v. Knights*, 2 M. & W. 894.

But suppose we are wrong in all the foregoing propositions; then we insist that the court should have ordered a verdict for the plaintiff for the whole land. The defendants are estopped by that decree, as to all claims to the lot prior thereto. Mason's deed to the defendants gave no title—Mason had no title to convey. If Mason had had title, his deed would have been void, for the land was in the adverse possession of the plaintiff. No person has a right of entry into lands when he cannot sustain an action of ejectment therefor. The defendants being in possession under the title of Hooper, claiming Marshall's interest, are estopped by the decree from buying in an outstanding title, and setting it up against the plaintiff.

The court should have charged according to the plaintiff's 5th request. Richardson claims to own the land now, and testified that he never gave up his possession to any one. The court should have charged according to the 6th request. The plaintiff was entitled to a charge according to his 7th request. If Richardson left when ordered by the plaintiff, and has not been back to do anything for seven years, and the piece has grown up to bushes, it was clearly an abandonment of the lot, and the court should have so charged. The plaintiff was entitled to a charge according to his 8th request. The court should have charged according to the plaintiff's 9th and 10th requests. The contract made between Carpenter and Richardson, if made before Richardson cut the timber, did not authorize an entry on the land by Richardson; and its being made more than two years after the cutting, was no recognition of any right of entry on his part. *Whitcher, admr.* v. *Morey,* 39 Vt. 459.

The court should have charged according to the plaintiff's eleventh request. No stranger to the title can intrrrupt the running of the statute, without his having authority from the owner of the land so to do.

The court should have charged according to the plaintiff's 12th request. If Mason had deeded to Perkins in 1834, the deed conveyed the title to Perkins's estate, and left no title to be conveyed to the defendants. The title to the lot is still in Jacob Perkins's

27

estate, and no person can convey any title to the lot until the will is proved in Vermont, and the estate duly settled here. And Carpenter, as legatee, could not enter on the lot, and interrupt the running of the statute, without being first authorized by the probate court for the district of Caledonia. Neither could Mason, or any one under him, enter on the plaintiff or the intestate. No one had any authority to interfere with the lot, and could not convey any of it to any other person. The statute of limitations having begun to run in the lifetime of the said Perkins, it continued to run since his death. The court charged the jury, that if Carpenter received the defendant's money for the deed from Mason, Carpenter would probably be estopped from setting up a claim to the lot, though the title was in Perkins's estate, and Mason had no title. This was error. An administrator of Jacob Perkins in this state, would not be affected by Mason's quit-claim deed. It would be void as to him.

The court should have charged according to the plaintiff's 13th request, that the plaintiff, as administrator, being in the adverse possession of the premises at the date of the deed to the defendants, it was void by the statute of frauds.

The court should have charged according to the plaintiff's 14th request. The plaintiff, as administrator, on the 30th of April, 1869, recovered a decree in chancery against the defendants for the McLane part of the lot. This was three months and more after they had their deed, and they should have presented their claim in that trial, as, if they had any title by their deed, it would have been a defence to that suit. They knew of this defence and withheld it, and are now estopped from setting up any defence that they then had, and could have set up in defence of that suit. The defendants claim title from two sources—the Taisey sale, and by possession. The Taisey sale is defective, and conveys no title. There was no sufficient proof of the old book produced by the defendants, and called by the court the book of the original proceedings of Taisey. There is no proof that the committee ever settled their accounts according to law before sale, therefore there was no authority to sell. There is no evi-

dence of a tax-bill in the case—the old book is no evidence. 12 Vt, 674.

The evidence does not show a continued possession of fifteen years, according to the definition of the judge in his charge. But it may be said that the jury have found that fact. But the error of that is, there was nothing to go to the jury on which to found it. The charge of the court, that as Mason had a deed on record, the acts of Page at once extended to the whole lot, was erroneous. None of them ever claimed under Mason, and his name was not mentioned ; they claimed under Jacob Perkins, who had no color of title.

The court erred in their charge as to the abandonment of the lot. It was of no importance what Samuel Page said or did in the premises, as he never tendered his $25 ; but the question is, what did the owner of the land do ?

*J. P. Lamson* and *H. H. Powers*, for the defendants.

The Taisey land sale, June 13, 1833, was regular. The 1st, 4th, 6th, and 7th objections pointed out by the plaintiff, are sufficiently answered by the records. The original proceedings, as recorded in the " old book " of Taisey, were properly admitted and proved. The statute then in force, required the collector to return his proceedings to the town clerk for record, &c. This contemplates that he shall keep a *quasi* record of his doings, otherwise he has no proceedings to return to the clerk. Hence, his proceedings themselves have the force of a record ; and the best evidence of such record, is the original instrument itself, which in this case was proved in the usual way where the signers are dead. But all the facts set forth in the " old book," were duly proved at the trial by the town clerk's records, which records are by statute declared to be " full evidence," &c. Hence, the proceedings of Taisey are properly established. It was unnecessary for the committee's advertisement to set forth the town where the legislature sat when the tax was voted. The case of *Culver* v. *Hayden*, 1 Vt. 359, holds that the collector's advertisement must state the place where the legislature met ; and the case

goes upon the ground that the legislature fixed a form for his advertisement, and enacted that the place of session should appear, and the form embraced such place. No such strictness would have been required by the court in that case, if the statute had been silent as to the place. No form whatever is given for the committee's advertisement; but they are simply to advertise in certain papers a notice to land-owners to work out their taxes.

The plaintiff claims that the declarations of Richardson to him in February, 1866, have the force of an estoppel. If Richardson is to be regarded as an agent of the owners of the Perkins-Mason title, in doing what he did on the lot, his declarations subsequent to his acts are of no importance as against these defendants. If he stands in the position of a claimant or owner in this chain of title, he is not estopped, nor are these defendants, by his claim made in February, 1866. The bill in chancery then served was brought to remove the cloud upon the plaintiff's title, made by the attachments upon Marshall's hotel property. Richardson examined this bill in chancery, and then makes a claim inconsistent with the claim of both orator and defendants in that bill; in fact, sets both sides at defiance. Now it is the essence of an estoppel, that the party inquiring be misled to his injury, in the matter then in hand. This answer of Richardson did not affect Wing's rights, or alter his action in relation to the attachments then relied on by these defendants to three acres of the lot. *Hackett v. Calender*, 32 Vt. 97; Bigelow Estop. ch. 19. The plaintiff was bound by Richardson's answers in cross-examination.

The special findings of the jury sufficiently warrant the judgment below. The charge upon the subject of adverse possession was correct. The existence of the adverse possession of defendant's grantors, was a question for the jury; and if there was any proof tending to show it, their verdict will be upheld. So whether there has been any abandonment of such adverse possession, is a question for the jury, and by their verdict it is established that there was no abandonment in 1850, when Perkins was at Samuel Page's, in Newbury, or at any other time. The plaintiff's adverse possession is also destroyed by the special verdict.

The opinion of the court was delivered by

ROYCE, J. The first exception taken was to the admissibility of the record of the proceedings of the land sale of John Taisey, in 1833. The plaintiff claimed that the record was inadmissible for the following reasons :

1st. That there was no legal proof that the collector was sworn. The warrant recites that the tax was assessed by the legislature at the session held at Montpelier in 1831, and the appointment of John Taisey as collector of said tax. It is in the usual form, and dated December 13th, 1832. The certificate of the oath administered to the collector, immediately follows the record of the warrant, bears the same date, and recites that—

" John Taisey, of Groton, in said county, personally appeared and was duly sworn to perform the duties assigned him as collector of said tax, in and by the above warrant, as the law directs.

" Before me, JOHN DARLING, JR., *Justice of the Peace.*"

No form of oath is prescribed to be administered to the collector, and the statute only requires that before entering upon the duties of his office, he shall be duly sworn. The duties to be performed by the collector, were defined and described in the warrant, and his being sworn that he would perform those duties, as the law directs, answered the requirement of the statute.

3d. That the committee's advertisement did not name the town where the legislature set* when the act assessing the tax was passed. The right of the landowners to work out their respective taxes by applying to the committee, is secured by § 4, ch. 98, of the Gen. Sts., and by the same section, it is made the duty of the committee to notify the landowners, by advertising the same three weeks successively, at any time between the first day of May preceding the time when such work is to be done. No form is given for such advertisement, or directions given as to the manner of making it. It is apparent that the object and purpose in requiring it is, to give public notice to landowners, that they may if they choose, pay their taxes in labor ; and any advertisement that answers this purpose is sufficient. The advertisement of the committee was full and ample for this purpose. The act

* This error in the exceptions was corrected for the press.

of 1796 prescribed a form for the advertisement to be used by a collector, by which he was required to state the place where the legislature held its session when the tax was granted; and in *Culver* v. *Hayden*, 1 Vt' 259, the omission to state such place in a collector's advertisement, was held fatal, for the reason, that the following of the form was a positive requirement of the statute, and must be regarded as a condition precedent to the conveyance of a good title. But those reasons have no application here, because there is no form given to be followed.

4th. That there is no proof of a tax-bill. The statute no where in terms requires that a tax-bill should be made; but it was held in *Brown* v. *Hutchinson*, 11 Vt. 568, that inasmuch as the collector was required to give bonds to the committee in double the amount of the tax he was appointed to collect, that some statement of the taxes unpaid was necessary to be furnished to the collector as the basis of his proceedings ; and in *Chandler* v. *Spear*, 22 Vt. 388, the court, in speaking of the rate-bill, say, that all that can be required is, that it distinctly and clearly shows the correct sums which each proprietor is to pay, and for the non-payment of which his right, or a sufficient quantity of it to pay the tax, is to be sold. It appears by the record, that a schedule or list of the lands in Groton, subject to the payment of taxes, must have been furnished to the collector, in which the original grantees' names, the divisions, numbers, and description of the lots, number of acres in the lots, and tax, appeared, for this immediately precedes, on the record, the record of his return of his proceedings, and in said return he certifies that the foregoing are true records and entries of his proceedings in the collection of the tax therein described. This was sufficient to establish, *prima facie* at least, that such a tax-bill was furnished to the collector as the law requires.

6th. That there is no proper certificate of the committee's and collector's advertisement on record. It has been repeatedly held that the form of the record used here is sufficient; and if any objection can be made to it, it must be to the verification. The town clerk first certifies that these proceedings were all re-received for record, June 14, 1833, and on the 3d of June, 1870,

he certifies that they are true copies of record. In the absence of proof to explain what appears of record as to the time when the proceedings were in fact recorded, the legal presumption is that they were recorded when received for record. What has been said in relation to the objection last considered, is so far applicable to the 7th, that further consideration of that objection would be useless.

The 8th objection is too vague and indefinite to require consideration; so that as far as any specific objections appear to have been made to the proceedings in the Taisey sale, we discover no error in the court's overruling them. We have determined these questions upon the record evidence; hence there is no necessity of deciding the question as to the admissibility of the original proceedings and tax-bill found among the papers of John Taisey after · his decease. We understand from the case as it comes here, that all of the evidence submitted in connection with John Taisey's sale, was contained in the record referred to from the town clerk's office ; and the court, upon that evidence, for the purposes of the trial, held that the sale conveyed a valid title to George S. Mason. The statute, by § 1 of ch. 98, provides that no lands within the state which are or may be liable to the payment of taxes for making and repairing roads and building bridges, shall be exposed for sale for the payment of such tax, until the account of the committee shall have been approved by the county court. It has been often held in this state, that when the statute under which the sale is made, directs a thing to be done, or prescribes the form, time, and manner of doing any thing, such thing must be done, and in the form, time, and manner prescribed, or the title is invalid ; and in this respect, the statute must be strictly if not literally complied with. *Spear* v. *Ditty*, 9 Vt. 282 ; *Bellows* v. *Elliott*, 12 Vt. 574 ; *Sumner* v. *Sherwin*, 13 Vt. 612 ; *Carpenter* v. *Sawyer*, 17 Vt. 124 ; *Chandler* v. *Spear*, *supra*. The party who sets up a title must furnish the evidence necessary to support it ; and if the validity of a deed depends upon the performance of any act, the party claiming under the deed is bound to prove its performance. The approval of the committee's account was made a condition precedent to the right to expose the lands for sale ;

and no title would pass under a collector's sale, unless this condition was shown to have been complied with ; so that the court erred in holding that George S. Mason acquired a valid title under the Taisey sale.

The exception to the order and ruling of the court in the matter of the deposition of Charles H. Carpenter, was well taken. The same question was before this court in *Wait* v. *Brewster*, 31 Vt. 516; and it was there held that when a deposition is taken with notice, the party taking it may or may not use it, as he sees fit, and cannot be required by his adversary to produce it ; and that, inasmuch as there was no law requiring it to be filed, filing it was mere supererogation. We see no occasion to modify or alter that rule.

The only title which the plaintiff's intestate claimed to the lot in question, was under the deed from Daniel Coffrin to Samuel R. Hooper, her grantor, dated March 8th, 1853. There was a public sale of the lot by Coffrin, as collector of a special tax, to Hooper, on the 9th day of September, 1851. It was admitted that that sale was invalid to convey the title ; and all that was claimed under it was, that it gave color of title. The plaintiff's evidence tended to show, that in the fall of 1851, Samuel R. Hooper entered upon the lot under a claim of title, and cut some timber, for the purpose of taking possession of the lot. The plaintiff claimed that this entry, being followed by a deed from Coffrin, in March, 1853, gave him a constructive possession of the whole lot. The sale of the lot by Coffrin to Hooper, though in terms absolute, was in fact conditional—the owner having the right to avoid the sale within the time limited by the statute, by the payment of the taxes and cost for which it was sold. The sale gave Hooper no right to enter upon the land, certainly, until the time limited for its redemption had expired, and gave him no color of title which would extend his possession constructively beyond the limits of the land actually occupied. The court were therefore right in holding that his colorable title must be restricted to the time of his obtaining his deed from Coffrin.

Admitting the Taisey sale to be invalid to convey the title, both parties were remitted to a possessory title. The plaintiff's evi-

dence tended to show that his possession was of such a character, and continued for a sufficient length of time, as to acquire a perfect title, unless it had been interrupted. For the purpose of showing that it had been interrupted, the defendants relied upon the testimony of Christopher Richardson, as to acts done by him upon the land in connection with the claims made to the same, in 1865. The plaintiff being in possession at that time, could protect his possession as against every one but the real owner; and he had the. right to treat all who entered upon the land as trespassers, unless they entered under the authority of the owner. An entry upon land in the possession of another, in order to work a legal interruption of such possession, must be made under such circumstances as to enable the party in possession, by.the use of reasonable diligence, to ascertain the right and claim of the party making the entry. The claim is, ordinarily, a question of intention, and can only be ascertained by evidence of what the party may have said in connection with his acts. It was admitted that what Richardson said while upon the land, and in the performance of the acts which it was claimed were acts of possession, was proper evidence in chief upon the question of his claim. The plaintiff introduced evidence tending to show that Richardson, in 1866, and while he was claiming to own the lot, upon being inquired of by what title he claimed to own it, replied that he claimed it under the Harris heirs, and claimed that this was evidence in chief upon the question of his claim or right at the time he made the entry in 1865. The court held that it was not evidence in chief, and could only be used to impeach the witness. Richardson acquired no right to the land subsequent to his making the entry and before making this admission, and hence this admission should have been received as evidence upon the question of the claim he made to the lot at the time he entered upon it in 1865. It is to be borne in mind that at the time this admission was made by Richardson, the defendants had no interest in the lot to be affected by it. Their deed, under which they claim to avail themselves of the benefit of the acts done and claims made by Richardson, being dated January 23d, 1869, plainly distinguishes

28

the question here presented, from the one made in *Halloran* v. *Whitcomb*, 43 Vt. 306, and the cases there cited.

The testimony of Goodwin was properly excluded. The lot the plaintiff proposed to inquire of him about, had no connection with the lot in controversy; and the object in the introduction of the evidence was, to impeach Richardson, by contradicting his evidence upon a collateral matter drawn out upon his cross-examination.

It becomes important to consider the testimony of Richardson, in connection with the plaintiff's 8th request. We understand that all that was material in his testimony bearing upon the questions of his acts done upon the lot and claims made to it, is detailed in the exceptions, and that the charge of the court upon this branch of the case, was predicated upon that testimony. The McLane Marshall portion of the lot, was occupied by Marshall and those claiming under him, under a license given by Hooper in 1857, down to 1869; and in the deed given by Hooper to the plaintiff's intestate in 1869, he reserved the right of Marshall to occupy that portion of the lot as long as he kept a hotel on the premises. Those holding possession of this portion of the lot, held it subject to the reserved rights of Hooper, but their possession was adverse to every one else. The court rightfully gave the plaintiff the benefit of their possession, in extending his constructive possession to the entire lot; and before he can be deprived of the benefit of this possession on account of its being interrupted, it must be shown that some act was done on this portion of the lot that, as before stated, would operate as notice to the party in possession, that the party performing such acts thereby intended to take possession, and of the claim of right that he made to the land. We find nothing in the evidence that tended to show that any such act was done or claim made. The court charged, if the jury found that the acts of Richardson upon the other portion of the lot, were done as acts of possession of the whole lot, and were so understood by those claiming under Marshall, that they would work an interruption of the possession of those claiming under Marshall. And this was error.

The plaintiff put in evidence a decree obtained at the March term of Washington county court of chancery, 1869, in a suit in which he as administrator of the intestate was orator, and these defendants and others were defendants, and claimed that the defendants were thereby estopped from setting up any claim to the McLane Marshall portion of the lot, under any title that they might have brought in during the litigation, and held prior to the trial in the suit in chancery. The decree was dated April 30, 1869, and the deed from Mason to the defendants, under which they now claim title, was dated January 23d, 1869. It will be seen by reference to the decree, that the Mason title was not presented or litigated in that suit. The defendants might have been permitted, upon application made at any time before a final decree was made, to set up the Mason title. But because they neglected to do so, it is not to be treated as *res adjudicata*, and they thereby estopped from availing themselves of it now. The effect of verdicts and judgments upon parties, depends upon the question whether the same point was in issue, or whether under the pleadings it might have been controverted. Herman's Law of Estoppel, 92, 93. The decree, by its language that "the land, after the removal of the buildings as aforesaid, shall belong to the orator, free of all claim of the defendants to the same under the title of said Marshall," precludes the belief that any title was adjudicated except the Marshall title.

The plaintiff was entitled to the instructions asked for by his 3d request, and this request seems to have been substantially complied with. The court say, that Leverett Page or Samuel Page might have commenced an adverse possession, and have voluntarily abandoned it before it ripened into a perfect title, and if they did thus abandon it, that would be an end of all their possession prior to such abandonment; and that he explained and illustrated the several propositions contained in the charge, to enable the jury better to understand them. From this we understand, that the attention of the jury was called to the evidence bearing upon the question of what would constitute an abandonment of their possession.

There is nothing in the case upon which the instructions asked

for in the 4th request can be predicated ; because the request im-
plies that there was some evidence of an entry upon the lot by
Page after the decease of Perkins, that would or could be treated
as an act of possession.   The contract between Page and Perkins
was made in 1841, and Perkins died in 1856.   Page's possession
commenced under his contract long prior to Perkins's death, and
whatever was done by him upon the lot, was a continuation of his
possession taken under the contract.   The death of Perkins did
not put an end to the contract made with Page ; and whatever rights
Page had under the contract, he could transfer to Richardson.

A compliance with the plaintiff's 5th request, would have ex-
cluded those claiming under the Perkins title, from the benefit of
the acts done by Richardson, although done under a license from
Page, and this would have been error.   The acts done by Rich-
ardson, if done under a license from Page, are to be considered
the same as if they had been done by Page ; and such acts would
enure to the benefit of the party holding the title under which
Page took possession.   The court, in the charge as to the effect of
the acts of Richardson, say, that if he did such acts under the
Mason or Perkins title, and entered ₁upon the lot and cut down
one half or three fourths of an acre of brush, wood, and timber,
and did other acts, such as his testimony tended to show, under
this title, under an arrangement with Samuel Page, such as his
evidence tended to show, if his conduct was subsequently assented
to and ratified by Carpenter, who owned the Mason title, it would
be an interruption of the plaintiff's intestate to all of said lot
except what was occupied by those acting under Marshall.   Under
this ruling, the jury may have found that if these acts of Richard-
son were done under the title which Mason acquired by the col-
lector's deed under the Taisey sale, given in 1834, they inter-
rupted the plaintiff's intestate's possession.   We have already
seen that it was not shown that Mason acquired the title by that
deed, and whatever right he did acquire, he conveyed to Perkins
prior to 1836, so that Mason could not have acquired a posses-
sory title.   Hence, an entry upon the land, and doing acts of pos-
session under that title, would not interrupt the possession of the
plaintiff's intestate.

The deed from Mason to Perkins was never recorded, and Perkins died in 1856. Perkins devised this lot to Charles H. Carpenter, but the will was never proved in this state, and it was by the procurement of Carpenter that Mason executed the deed to the defendants under which they now claim title. The court held, that although the deed from Mason to Perkins, though unrecorded, conveyed the title to the lot to Perkins, and the same would descend to Carpenter by Perkins's will, yet if Carpenter received the defendants' money, and obtained a deed from Mason to the defendants, rather than place Mason's deed to Perkins on record, and proceed and settle Perkins's estate in this state, and convey the lot to the defendants, Carpenter would, probably, be estopped from asserting the title in himself, through the will of Perkins. At least, the defendants stood in such relation to the lot, being in possession, that they could justify under their deed from Mason, if the Mason, Perkins, or Carpenter title, which ever it might be, was valid. Assuming (what is not decided) that the title which Mason acquired by the collector's deed, could be conveyed in the manner attempted, it becomes important to consider what title he had to convey. It was merely colorable, and only valuable to those claiming under it, in extending a possession constructively to the land described in the deed, and all the title Mason attempted to convey to the defendants by his deed to them, was the same that he conveyed to Perkins prior to 1836. Perkins claimed the lot under his deed from Mason, in his own right, and adversely to Mason; and the possessory title which the defendants' evidence tended to show was acquired by Perkins and those claiming under him, did not pass by Mason's deed to the defendants; it still remains in the estate of Perkins. As between Carpenter and the defendants, the defendants could, probably, avail themselves of the purchase made by them, as an equitable estoppel, against any claim that Carpenter might assert to the lot. But we have been unable to find that the defendants derived any title under their deed from Mason that they could justify under as against a party having a prior possession. The special findings of the jury are not available to the defendants, because they were upon evidence improperly admitted, and erro-

neous directions as to the use to be made of evidence, and, as we think, upon mistaken views of the law in the particulars pointed out.

Judgment reversed, and cause remanded.