Daniel R. HIGHTOWER, et ux.,
Plaintiffs-Appellants,

v.

Henry P. PENDERGRASS, et ux.,
Defendants-Appellees.

Supreme Court of Tennessee,
at Nashville.

Nov. 7, 1983.

Opinion on Petition to Rehear
Dec. 27, 1983.

Robert J. Walker, L. Wearen Hughes, Bass, Berry & Sims, Nashville, for plaintiffs-appellants.

O.B. Hofstetter, Jr., Nashville, for defendants-appellees.

OPINION

ALLISON B. HUMPHREYS, Special Justice.

This is an adverse possession case in which the question is, whether or not the permissive use of the disputed premises by the legal title holder, plaintiffs-appellants, amounts to such a re-entry as to oust the adverse holder and make unavailable the benefit of the seven year statute of limita-

tions provided by T.C.A. § 28–2–103 [1]. The Court of Appeals and the chancery court have concurred in the facts of the case, finding that defendants-appellees had had adverse possession of the premises for seven years and more when plaintiffs-appellants sued; and concurred in the disposition of the law question by holding that permissive entry does not oust the adverse holder, so that the seven-year statute does apply. We concur.

The chancellor made an adequate, succinct, fact finding, concurred in by the Court of Appeals, as follows:

Gentry Hale and J.B. Arlt, Jr. purchased a large tract of land on Hillsboro Road to build upon. Before any boundary lines were established, they built a barn for their children's horses. In 1968, the Arlts completed their house and the two families shared the expense of a permanent fence placing the barn on the Arlt's side of the fence. No boundary lines had yet been established and the barn was considered to be owned by both families.

In 1969, the Hales completed their home and the property was surveyed in order for the Hales to obtain a mortgage. Mr. Hale handled the survey; the boundary line was run through the middle of the barn. Mr. Arlt, however, believed the fence was established as the boundary line. He thought the barn was on his property but he believed that the Hales owned one-half of the barn itself.

Mr. Arlt testified that prior to 1971 the Arlts had paid the bills for various joint expenses such as clearing land, building roads, fences, and a bridge, and legal expenses to secure a utility easement. The Hales were to reimburse the Arlts for one-half of these costs. When the Hales sold their home to the Howards in 1971 and failed to settle accounts, the Arlts decided not to raise the issue but simply to consider the barn as fully theirs. Mr. Arlt claims that after 1971 he asserted to the Howards, his new neighbors, that the barn belonged to him although he permitted them to use it.

When the Howards sold to the Murphys the Murphys were told the barn belonged to the Arlt family but that they could use it with the Arlt's permission.

In 1975, the Murphys sold to the present owners, the plaintiff Hightowers. The real estate agent handling the sale testified that she told the Hightowers the barn was the property of J.B. Arlt but that sharing arrangements could probably be worked out. She pointed to the existing fence as the property line. The contract of sale signed by the Hightowers did not mention the barn. After the Hightowers moved in, they arranged with the Arlts to stable a horse in the barn.

In 1976, the Arlts sold their property to the defendants Dr. and Mrs. Pendergrass. Mr. Arlt and the real estate agent pointed out the existing fence as the property line and the property was publically [sic] listed as including a house, pool, pond, and barn. The property appraisal furnished to the Pendergrasses included the barn and the contract of sale listed a barn.

Since 1969, the taxes on the barn have been assessed to and paid by the Arlts and then the Pendergrasses. The Arlts and Pendergrasses have paid all utility bills for the barn for the past twelve years. From 1968 to 1976, the Arlts paid all costs for maintaining the barn, including cleaning, maintenance and insurance. Since 1976, the Pendergrasses have paid to have the barn insured, painted and generally maintained.

In 1979, the Hightowers had a survey done which indicated that the property line ran through the barn. A dispute arose and the defendants threatened to

---

1. T.C.A. § 28–2–103(a) reads as follows:

No person or anyone claiming under him shall have any action, either at law or in equity, for the recovery of any lands, tenements or hereditaments, but within seven (7) years after the right of action accrued.

remove the plaintiffs' horses and possessions from the barn. The plaintiffs sued for an injunction.

■ This finding makes out adverse possession in the defendant-appellees, and makes applicable the seven year statute unless permissive use amounts to such a re-entry as to oust the adverse holder.[2]

The Court of Appeals in disposing of the permissive use question found it to be novel and on this account an appeal to this Court was granted.

■ The permissive use question is answered by the general rule as to the kind of entering onto the premises by the title holder necessary to oust the adverse holder. This general rule is discussed in our two leading law encyclopedias. In 3 Am.Jur.2d *Adverse Possession* § 89 it is stated: "An adverse possession can be interrupted by ouster on the part of the owner. The running of the statute of limitations will be tolled by the owner's entry upon the land where accompanied with an explicit declaration of his purpose to repossess himself thereof, or by such open and notorious acts of dominion as make that purpose manifest." This statement is supported by citation of numerous cases. In 2 C.J.S. *Adverse Possession* § 173 the headnote reads: "An owner's entry in order effectively to interrupt adverse possession, must be with the intention of possessing the land and must clearly indicate to the adverse occupant that the owner intends to repossess the land."

This general statement is supported by citation of cases. This rule is discussed at length in *Batchelder v. Robbins,* 93 Me. 579, 45 A. 837 (1900). In the course of the opinion in this case several authorities are referred to. We quote therefrom:

"In Wood, Lim. Act. § 270, the principle is thus stated: 'An entry by the legal owner upon the land breaks the continuity of an adverse possession when it is made openly with the intention of asserting his claim thereto, and is accompanied with acts upon the land which characterize the assertion of title or ownership; . . . . The entry must be made openly, with the purpose of ascertaining his claim thereto and must be accompanied by acts of ownership which characterize and effectuate the claim.' See, also, Buswell, Lim. § 274.

In *Robinson v. Swett,* 3 Me. 316, it is said: 'An entry into land to purge a disseisin should be made with that intention, and such intention should be sufficiently indicated either by the act itself or by words accompanying the act.' . . . .

In *Burrows v. Gallup,* 32 Conn. 493, the court said: 'When a party is once dispossessed, it is not every entry upon the premises without permission that would disturb the adverse possession. He may tread upon his own soil, and still be as much out of the possession of it there as elsewhere. He must assert his claim to the land, perform some act which would reinstate him in possession, before he can regain what he has lost. It is evident, therefore, that an entry by stealth, under circumstances that go to show that the party claimed no right to entry, would not be sufficient to break the continuity of exclusive possession in another.'

In *Wing v. Hall,* 47 Vt. 182, the rule is thus stated: 'An entry upon land in the possession of another, in order to work a legal interruption of such possession, must be made under such circumstances as to enable the party in possession, by the use of reasonable diligence, to ascertain the right and claim of the party making the entry.'

So, in *Altemus v. Campbell,* 9 Watts, 28, Gibson, C.J., said: 'The effect of an entry, it is agreed, depends upon the intent of it, expressed by words or intimat-

---

2. The essential requirements of adverse possession are delineated in cases collected in note fourteen to T.C.A. § 28–2–101. These are exclusive, actual, adverse, continuous, open and notorious possession for the entire prescriptive period under claim of right thereto.

ed by an act equally significant. I would say, in a few words, that there must be an explicit declaration or an act of notorious dominion by which the claimant challenges the right of the occupant; or it cannot, perhaps, be better defined than by saying that the entry must bear on the face of it an unequivocal intent to resume the actual possession.' See, also, 1 Am. & Eng.Enc.Law (2d Ed.) p. 836, under 'Nature of Re-entry Required.'" 45 A. at 839–40.

It is obvious that when measured by these statements of the rule, a permissive entry can have no effect at all on an adverse possession. So, the holding of the chancellor and the Court of Appeals on this point is correct.

Plaintiff-appellants make one other contention: That having been in possession when they gained a temporary restraining order continuing them in possession, T.C.A. § 28–2–103 does not apply, because it is intended to protect possession.

The obvious fallacy of this proposition is that when plaintiffs-appellants sought to change their permissive possession to actual possession under title, and sought the aid of the law in this, they placed the character of their possession in judgment, and when it was found to be illegal, as it was and as it is, they are not entitled to the aid of the law in continuing them in that possession. So the temporary restraining order was dissolved. The effect of this was to authorize the defendant-appellees to take exclusive possession of their adversely held property. Moreover, T.C.A. § 28–2–103 does apply to bar a suit for a restraining order when the effect of the order is to defeat the purpose of the statute, which is to protect the adverse holder in his possession.

This discussion of the general rule as to what is required to constitute a re-entry must not be read as an invitation to claimants out of possession to enter upon claimed

land by force of arms. It is not. In *Norvell v. Gray's Lessee,* 31 Tenn. 96, 97 (1851), where the case involved a re-entry against an adverse possessor with color of title, and to this extent is not in point, the Court construed chapter 28, Acts of 1819, from which T.C.A. § 28–2–101, § 28–2–102 and § 28–2–103 derive and the Court said:

"We think the manifest design of the act of 1819 was to exclude the remedy by entry as it existed at the common law. The statute was intended to preserve the peace and repose of the community. To put a stop to litigation respecting dormant titles, as well as to the struggles of individuals to redress their injuries by their own acts—a policy certainly not to be discouraged by the courts." *Id.* at 106.

This statement, which is applicable to the entire Act, would seem to put a claimant, whether his claim is against one holding under color of title or one who has peaceably entered into possession without title and has held it under such circumstances as to commence the running of the statute of limitations in favor of his adverse possession, to an action at law to abate the adverse holding.

If, as the Court said in *Norvell,* the purpose of the Act is to take out of the hands of the claimant the means of personally redressing the alleged wrong, a remedy which could and likely would lead to a serious breach of the peace, the Act applies whether the adverse possessor is on the property under color of title or there under a claim of adverse possession which has been perfected or is in the process of being perfected. In order to dispossess trespasses of this character, the statutes of Tennessee afford ample remedies, and the policy of the law that requires that such disputes be settled peaceably applies as strongly today as it did in 1851 when *Norvell* was written.

We agree with all that the Court of Appeals had to say about this case in their opinion, especially the holding that T.C.A. § 28–2–103 is defensive in nature and does

not operate to give defendants-appellees title to the adversely held land.

The judgment of the Court of Appeals affirming the Davidson County Chancery Court is affirmed. Costs are adjudged against plaintiffs-appellants.

FONES, C.J., and BROCK, HARBISON and DROWOTA, JJ., concur.

## OPINION ON PETITION TO REHEAR

A petition to rehear has been filed making certain points which we shall discuss.

The first point is that under the facts of the case adverse possession never commenced. This contention is based on this proposition made in the petition. We quote from the petition:

> On page 3 of this court's Opinion, the facts indicate that Mr. Arlt, the predecessor in interest of the defendants-appellees, did not begin to claim title or right to all of the barn (one of the required elements of adverse possession) until 1971. However, as the Chancellor further found, this is also the time that the Howards became the residents of the adjoining property and Arlt permitted them to use the now disputed property. Therefore, even if these findings of fact are correct, the elements of hostility and exclusivity of possession, which are necessary to establish adverse possession, were never present in the beginning.

While it is a fact that Mr. Arlt's overt claim to the entire property was contemporaneous with the Howard's acquisition of the adjoining property, Howard recognized Arlt's claim and used the property with Arlt's permission. Under the authorities cited in the opinion this did not prevent the commencement of the adverse holding. To the contrary, Howard's recognition of Arlt's claim by using the property only with Arlt's permission is clear evidence that Arlt commenced adverse possession at the time found by the chancellor and by the Court of Appeals.

Plaintiffs-appellants say that even if these facts are true, (and they are, having been found by the trial court and by the intermediate appeals court) still there is no adverse possession because there was not hostility or exclusivity in the holding. This contention must arise on a misunderstanding of the meaning of the term "hostility" as used in adverse possession law. "Hostility" in possession does not require the adverse possessor to walk his boundaries inveighing against all who draw near, nor does it require the possessor to forcefully eject those who may come upon his adverse holding especially when they are there with his permission. The term does not imply ill will or actual enmity, but merely means that the party claims to hold the possession as his, against the claims of any other. *Ballard v. Hansen,* 33 Neb. 861, 51 N.W. 295 (1892); *Griffin v. Mulley,* 31 A. 664, 167 Pa. 339 (1895). Exclusivity does not imply that the possessor can never allow anyone on his adverse holding without the holding being broken but that the holder claims exclusive right to say who can and who cannot come on his possession. Under the record, Arlt exercised this right and held and claimed the land exclusively. 3 Am.Jur.2d *Adverse Possession* § 50 (1962).

With respect to the contention that the adverse possession was not continuous because after 1974 Arlt ceased to keep horses in the barn, it is sufficient to point out that he continued to claim the property as his own and exercised dominion and control over it by allowing others to use it. In this connection it should be stated that adverse possession through a licensee is the same as adverse possession through and by the claimant. What a claimant can do himself, he can do by an agent licensee or tenant. 3 Am.Jur.2d *Adverse Possession* § 15 (1962).

It should also be pointed out that during this period of time there was no one other than Arlt who claimed to own the barn property. Plaintiffs-appellants' predecessors in title continued during all of this time

to recognize Arlt's claim. So, as there was no one other than Arlt claiming the property during this time, there could not be and there was not any cessation of his adverse possession.

Plaintiffs-appellants ask that the opinion be clarified because the authorities first cited with respect to the nature of re-entry required to interrupt an adverse possession seem to be at odds with the citation from *Norvell v. Gray's Lessee*, 31 Tenn. 96, 106–07 (1851), with the result that the decision is unclear as to the plaintiffs-appellants' present rights with respect to the property.

The law cited on re-entry relates to re-entry attempted during the seven year period while or in which adverse possession is ripening. After this period has passed, T.C.A. § 28–2–103 protects the adverse possessor from suit at law or equity. The law puts the plaintiffs-appellants in the anomalous position of owning the cake but not being able to eat it: they own the title to the property but, because of defendants-appellees' adverse possession rights, are not able to make any use of the property. This is always the case where a statute of limitations bars the right to sue but does not extinguish the claim. The result is that unless defendants-appellees abandon their possession or agree that plaintiffs-appellants may re-enter and assert their ownership, there is nothing they can do.

FONES, C.J., and BROCK, HARBISON and DROWOTA, JJ.