# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 1, 2012 Session

## SHERMAN LANE PIERCE, ET AL. v. JAMES H. DELASHMITT, ET AL.

### Appeal from the Chancery Court for Meigs County
### No. 4278    Frank V. Williams, III, Chancellor

### No. E2011-02748-COA-R3-CV-FILED-NOVEMBER 19, 2012

Sherman Lane Pierce and Cathryn Pierce ("the Pierces") own real property in Meigs County, Tennessee. James H. Delashmitt and Minnie C. Delashmitt ("the Delashmitts") own real property that adjoins the Pierces' property. The Pierces sued the Delashmitts alleging, among other things, that the Delashmitts had trespassed upon the Pierces' property and attempted to fence off a portion of the Pierces' driveway. The Delashmitts answered the complaint and filed a counterclaim asserting that the Pierces had trespassed on the Delashmitt's property. After a trial, the Trial Court entered its order finding and holding, *inter alia*, that the Pierces had adversely possessed a portion of the disputed property. The Pierces appeal to this Court raising issues regarding whether the Trial Court erred in finding and holding that the Pierces failed to prove adverse possession as to the entire disputed area. The Delashmitts raise an issue regarding whether the Trial Court erred in finding and holding that the Pierces adversely possessed any portion of the disputed property. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
### Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Rebecca L. Hicks, Dayton, Tennessee, for the appellants, Sherman Lane Pierce and Cathryn Pierce.

Barrett T. Painter, Cleveland, Tennessee, for the appellees, James H. Delashmitt and Minnie C. Delashmitt.

## OPINION

## Background

The Pierces have lived on their property at 632 Pierce Road in Birchwood, Tennessee since 1992 or 1993 ("the Pierce Property"). They purchased the Pierce Property from Mr. Pierce's mother, Hazel Pierce, in 1982. The Delashmitts live at 513 Lawson Road in Birchwood, Tennessee ("the Delashmitt Property"), which adjoins the Pierce Property. The Delashmitts purchased their property from Uyless B. Wood and Ruth Wood in 1974. The area in dispute ("Disputed Area") in this case consists of approximately .7 of an acre. The Disputed Area encompasses a portion of a gravel driveway and a small two-room house referred to by the parties as a shack ("the Shack").

In March of 2006, Mr. Delashmitt sent a letter to the Pierces, which stated: "I am in the process of having my property line surveyed. I would appreciate if you would move all vehicles and other materials from my property line." In November of 2007, Mr. Delashmitt sent another letter to the Pierces, which stated: "This is a reminder that there has been **no** line or corner established at this time. In the meantime you have installed a propane tank and other material on my property. Please remove them immediately."

In September of 2008, the Pierces sued the Delashmitts. The case proceeded to trial in March of 2010. The parties stipulated to the introduction of a survey ("the Survey") prepared by Richmond Surveying Company. An excerpt from the Survey, which shows the Disputed Area, has been reproduced as Exhibit A to this Opinion.

At trial, the Pierces conceded that the Disputed Area is encompassed within the property description contained in the Delashmitt's deed to the Delashmitt Property. The Pierces also conceded that the Delashmitts, not the Pierces, had paid the property taxes on this area since the Delashmitts purchased the Delashmitt Property. The Pierces, however, asserted that they owned the Disputed Area by virtue of adverse possession.

Mr. Pierce testified at trial and explained that his mother purchased the Pierce Property in approximately 1951, and that he grew up there. Mr. Pierce lived on the Pierce Property from the time he was about 6 years old until he joined the Navy when he was 18 years old. Mr. Pierce served in the Navy from 1963 until 1972. He moved back to Tennessee in 1972 and remained there until 1977 or 1978 when he went back into the Navy for another tour of duty. Mr. Pierce remained in the Navy until 1990. From 1990 until 1993, Mr. Pierce lived in Cleveland, Tennessee for a while and then elsewhere in Birchwood, Tennessee. He moved back on to the Pierce Property in August of 1993.

When asked about when the problem between the Pierces and the Delashmitts arose, Mr. Pierce stated:

It was sometime, give or take, about four years ago. I was driving a truck and my wife got a job at Wal-Mart over in Dayton, and we might - - I was gone a lot. I would come in, and I could see maybe where they had put a fence up or moved a fence or took a fence down. This went on for some time. They sort of tried to patch up that one and used it for a little bit that was the perimeter fence up here (indicating), all the one on the outside that Mr. Wood had put up. I guess they got tired of trying to patch it up, and they put an electric fence up.

A fence would be up here (indicating) one day. The next week or something they would catch us gone, and they would come up there when we were gone and just take maybe two or three fence posts up and then move them over or put another strand of wire on it or change which way the fence went, from this direction to that direction (indicating). It seemed like it moved every week when they would catch us gone.… Yes, ma'am, about four years ago. That's when they came in and tried to tear out every marking of any fence ever being out there down, but there's still trees out there with wire growing through them that they failed to get down. That fence that they've got up there now, I guess it's been in the same spot longer than any that they've had up there.

Mr. Pierce testified about when he was growing up on the Pierce Property. He testified that he and his brothers cleared out an area near the driveway and "put gravel on it and widened it out because we dealt in junk cars and stuff like that." Mr. Pierce testified that when his family first moved to the Pierce Property, and he was 7 or 8 years old, he had rabbit pens and his sister had chickens in the Disputed Area. Mr. Pierce testified that when he was growing up he, his brothers, or his father and mother mowed and maintained the Disputed Area.

Mr. Pierce agreed that a portion of the driveway he uses is in the Disputed Area. Mr. Pierce testified that he has used the driveway ever since his family moved to the Pierce Property when he was 6 years old. The driveway was there in 1951 when the Pierce Property was purchased by his mother, and Mr. Pierce still uses it today. He further stated that the area he is claiming by adverse possession contains a doghouse that belongs to him. Mr. Pierce stated that he has had a doghouse in that area for 10 or 12 years.

Mr. Pierce's father built the Shack in the Disputed Area in 1963 or 1964 and lived there until a year or two before his death in 1980. When asked what use he has made

of the Shack, Mr. Pierce stated:

> Well, like I said, I got into the habit of having junk cars and buying junk cars and this, that and the other, and I have had car parts and car tires and stuff like that stored in it for quite some time and did have until about three, four or five years ago.

Mr. Pierce was asked when the last time was that he had used the shack, and he stated:

> Sometime around when Mr. Delashmitt sent me the letter to move everything off of the property. I had a wrecked pickup truck that was sitting down there. It had a bunch of parts in it, and I also had a bunch of parts in that shack. And I removed them and put them in the back of the pickup truck and took it over to my other property off of Highway 60. That's the last time I've used the shack.

Mr. Pierce admitted that he has not made any use of the Shack since November of 2007. He further admitted that the Shack is run down and cannot be used without a lot of work being done on it.

> Mr. Pierce was asked what use was made of the area between the driveway and the Shack, and he stated:

> Well, there's a large - - I don't know if it's a red oak or a white oak, but it's a large oak tree. My brother and I climbed the tree and put cables and strength chains on it, and we used it to load cars. We'd pick cars up off the ground and load them on the truck with that tree. We worked on cars and changed tires, and that tree - - and all around that tree, all around it is where we would pull them in. We might have three or four sitting there and one hanging in the tree and this, that and the other. That's mainly what it was used for is we were running a salvage yard, I guess you would say.

Mr. Pierce and his brother sometimes worked on other people's cars. Mr. Pierce admitted that he has not done anything with the junk vehicles since 2007 when he received the second letter from Mr. Delashmitt.

> In response to a question about what he did to maintain the property between the driveway and the Shack, Mr. Pierce stated:

> Well, Mom would make us pick up the trash once in a while. We would have

-4-

to mow some of it. We hauled rocks in there to put on it to keep the mud down. And some of the backside down here, we've had to mow that. Daddy had me behind the tiller for a while.

Mr. Pierce explained that Mr. Delashmitt erected an electric fence about three and a half to four years ago. He stated: "[t]hat fence keeps moving." When asked what use was made of the property behind the electric fence while he was growing up, Mr. Pierce stated:

My brother and my daddy made a garden, and a large portion of it, this portion here (indicating) - - my momma had a garden over here (indicating). Naturally, they put their garden close to it because my brother would till Momma's and then till theirs, or his and daddy's. And my dad had calf lots. From this corner (indicating), he would go up this way with a fence and then up behind where he was living so he wouldn't have to walk all the way down here (indicating) to feed the calves. The calves would come up to him to get fed.

When asked about the period of time when the land in the Disputed Area was used for a garden, Mr. Pierce stated:

Just about from the '60s when daddy put the shack up and the fence was up, I guess Daddy would always make a garden. Momma and Daddy truck passed all their life. Daddy would have a garden over there. He always tried to outdo Momma across the way. I guess probably from the '60s it always had something planted in it or bedded stuff. And they even had tomatoes planted in buckets where they would take them in under the trees and out of the trees and set them outside in the open.

Mr. Pierce admitted that the last time there was a garden in the Disputed Area was when his brother used the property in 1987 or 1988.

Mr. Wood was the predecessor in title to the Delashmitts. Mr. Pierce testified that his father and Mr. Wood were partners raising and selling calves. Mr. Wood erected a fence for the calves, which were kept, in part, in the Disputed Area. Mr. Pierce admitted when asked that no calves were put in the Disputed Area by his father or Mr. Wood since 1974 when the Delashmitts bought the Delashmitt Property. He further admitted that the Delashmitts have had cattle in portions of the Disputed Area since 1993, when the Pierces moved on to the Pierce Property.

Mr. Pierce admitted that after the Delashmitts purchased the Delashmitt Property they were the ones who maintained, repaired, took down, and moved fences. He stated that about four years ago the Delashmitts put up the electric fence and tore other fences down. He further admitted that after the electric fence was put up he has made no use of the property in the Disputed Area east of the electric fence. When asked, Mr. Pierce admitted that his father never told him he owned the Disputed Area, and that there was never any dispute between his father and Mr. Wood about ownership of the Disputed Area.

Terrell Douglas Delashmitt[1] is the Delashmitt's son. He owns real property close to the Pierce Property and the Delashmitt Property including some property south of his father's property. Terrell Delashmitt was 16 years old when his parents purchased the Delashmitt Property in 1974. In the mid 1970s, Terrell Delashmitt and his father walked the Delashmitt Property and repaired a fence in the Disputed Area. That fence remained until the mid 1990s when "the fence got unrepairable because so much brush was growing out in the fence and taking over the fence, so it was unrepairable." Terrell Delashmitt testified that he and his father moved the fence approximately 15 or 20 feet east of the original fence line. The fence remains today as the electric fence shown on the Survey. When he and his father walked the property in the mid 1970s, Terrell Delashmitt saw no garden in the Disputed Area.

Terrell Delashmitt has resided on or near the Delashmitt Property since 1974 and has never moved away from the area. He and his father have had cattle on the Disputed Area since the mid 1970s, and he and his father maintained the Disputed Area. Terrell Delashmitt testified that he never has seen Mr. Pierce doing any maintenance work in, or making any use of, the Disputed Area. Terrell Delashmitt, however, stated that Mr. Pierce has used the area west of the fence and further stated: "He's put scrap metal, concrete block, brick, got a doghouse on one corner of it, that type of thing, got a gas tank on it." Terrell Delashmitt further testified:

> The doghouse is right beside the big oak tree (marking). The gas tank is somewhere in this neighborhood (marking). And then all the other debris and type stuff, he's got a rack right in here (marking) that has shelves and stuff in it and then scrap metal and brick and block and that type of thing.

In 1993 there was no debris in the Disputed Area. Terrell Delashmitt started seeing debris in the Disputed Area in 1996 or 1997. He stated that the debris has "seemed to gather and increase since Mr. Sherman [Pierce] moved over there.… In 1993." Terrell

---

[1]In an attempt to minimize confusion, we shall refer to Terrell Delashmitt throughout this Opinion by his full name and continue to refer to the defendant, James Delashmitt, as Mr. Delashmitt.

Delashmitt was asked if he ever said anything to Mr. Pierce about the debris and stated: "Well, I don't think he was ever asked for it to be removed until the letter was sent to him, but we tried to let him be aware that there was a property line in there and it hadn't been properly located at that time." Terrell Delashmitt admitted that Mr. Pierce has mowed behind the electric fence and that he started doing this about three or four years prior to trial. Terrell Delashmitt never has seen Mr. Pierce doing repairs on cars in the Disputed Area, but agreed that Mr. Pierce has continued to use the driveway and has widened it. With reference to the driveway, Terrell Delashmitt stated: "[i]t became a parking lot."

Terrell Delashmitt testified that Mr. Pierce talked to him in 2007 about trading some real property, and stated:

And I told him, well, yeah, we would be interested in possibly doing that.

And I asked what he had in mind. Well, he wanted to leave me 50 foot out this way (indicating), and he wanted to take everything all the way down to here (indicating).

And I said, well, I don't think that would be a very fair trade.

James Delashmitt has lived at 513 Lawson Road for thirty-six years. He testified that he has paid taxes on the Delashmitt Property since he purchased it. He and his wife purchased the Delashmitt Property in 1974 and started putting cattle on it in 1974 or 1975. When Mr. Delashmitt purchased the Delashmitt Property, he walked in the Disputed Area with "Mr. Mood Campbell, C.L. Campbell, Mr. Wood and myself." He stated: "[Mr. Wood] showed me the lower line and showed me that it runs straight up by a big oak tree, or the oak tree wasn't that big then." Mr. Wood told Mr. Delashmitt that Mr. Wood had allowed Mr. Pierce's father to plant a garden back there. Mr. Delashmitt also testified that Mr. Wood told him that Mr. Pierce's father had built the Shack there. Mr. Delashmitt first saw a doghouse in the Disputed Area "after Mr. Pierce moved there in probably '94, '94 or '95."

Mr. Delashmitt first said something about the property lines in writing to Mr. Pierce in 2006. Mr. Pierce did not move the vehicles after Mr. Delashmitt sent the first letter. Mr. Delashmitt stated: "[h]e seemed to put more in." Mr. Delashmitt testified that he sent the second letter in November of 2007 because Mr. Pierce had moved a propane gas tank into the Disputed Area. Mr. Pierce did not move tank after Mr. Delashmitt sent the second letter.

Mr. Delashmitt testified:

I'd always go over there. I didn't want to - - really there's a period of time in there that I didn't say too much to [Mr. Pierce] about the stuff he had in there. I didn't want to keep him mad at me in some way until we got a line established in there and then it wouldn't make no difference. But I couldn't - - we couldn't get together on the line. I couldn't afford to pay for a surveyor to come in there, and so I felt that maybe me and Mr. Pierce could get together on the property line. That's the reason I didn't say nothing to him in that length of time.

After trial, the Trial Court entered its order on November 21, 2011 finding and holding, *inter alia*:

1. Payment of the real property taxes by Defendants, James H. Delashmitt and wife, Minnie C. Delashmitt (the "Delashmitts") are [sic] a presumption of title.
2. The Delashmitts have fee simple title to the 15.61 acre tract which lies north of the Plaintiff's [sic] property, which is undisputed by Sherman Lane Pierce and Cathryn Pierce (the "Pierces").
3. The Pierces are attempting to acquire the disputed property which is the subject matter of this lawsuit by adverse possession.
4. To hold property adversely, Plaintiffs must prove that they have held the property adversely, openly, continuously, and exclusively for twenty (20) years if the property is owned by another party.
5. The Pierces' uses against the Delashmitts as proven at trial are: gardening, maintaining, mowing, raising chickens and rabbits, but that use had been discontinued when this matter was tried. Plaintiffs must exclude and give notice to the world that they are claiming ownership of the disputed property and temporary uses as set forth above are not sufficient. Plaintiffs needed an enclosure to prove they were claiming against the world. The fences as set forth in Exhibit 3 which surrounded the garden are not the Pierces' and did not create fences to establish title by adverse possession. The fences were erected by the Delashmitts or the Woods. The testimony regarding the blue and green fences and the yellow line were placed there by adverse possession, but only for the purpose of holding cattle. None of the outer fences helped the Pierces to give notice to the world that they claimed title to the disputed area.
6. The most convincing testimony is Mr. Delashmitt's testimony regarding Mr. Woods. Mr. Woods showed him the line and followed the fence that is set forth in Exhibit 1 in a northerly direction to the fence line behind the shack. It is uncertain from the testimony who built the fence or who built the shack the senior Mr. Pierce lived in while he was alive.
7. From 1963 through Mr. Woods and Mr. Delashmitt, and through Mr.

Pierce, the senior Mr. Pierce lived on and off the property in the shack and did the best he could to keep it cleared.

8. The preponderance of the evidence in this matter is that the green line drawn by Terry Delashmitt on Exhibit 1 is the boundary line [("Boundary Line")] of the parties which runs from the oak tree as set forth in the northern line of Pierce and the southern line of Delashmitt as shown on Exhibit 1, through the maple tree and is intersected by a line 3 to 4 feet behind the shack and then in a westerly direction to the fence line. The preponderance of the evidence is that the Pierces acquired the property to the west of the line as described above by adverse possession.

9. Courts of equity aid people who protect their rights. The preponderance of the evidence is that Mr. James Delashmitt knew all along there was some dispute about the location of the line where he joined the Pierce property. Equity then imposes upon Mr. James Delashmitt to be diligent and to look after his rights. If Mr. James Delashmitt knew of the dispute he should have protected his rights to his property.

10. The electric fence erected by the Delashmitts was put up to control cattle and not as a means to indicate a boundary line between the parties.

* * *

ORDERED that all right, title, interest and any claim Defendants may have had to the property lying west and south of the above-described boundary line shall be divested out of Defendants and the property lying west and south of the above-described property line shall be vested in Plaintiffs by order of this Court.

The Pierces appeal to this Court.

### Discussion

Although not stated exactly as such, the Pierces raise two issues on appeal: 1) whether the Trial Court erred in finding that fencing or enclosure would be necessary to prove adverse possession; and, 2) whether the Trial Court erred in finding and holding that the Pierces failed to prove adverse possession as to the entire .70 acre area in dispute. The Delashmitts raise an issue regarding whether the Trial Court erred in finding and holding that the Pierces proved adverse possession of any portion of the Disputed Area.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence

is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first consider whether the Trial Court erred in finding that fencing or enclosure would be necessary to prove adverse possession. Our Supreme Court has instructed:

> In order to establish adverse possession under [the common law] theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. *Hightower v. Pendergrass*, 662 S.W.2d 932, 935 n.2 (Tenn. 1983); *cf. Menefee v. Davidson County*, 195 Tenn. 547, 260 S.W.2d 283, 285 (Tenn. 1953). Adverse possession is, of course, a question of fact. *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005). The burden of proof is on the individual claiming ownership by adverse possession and the quality of the evidence must be clear and convincing. *O'Brien v. Waggoner*, 20 Tenn. App. 145, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936). The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. *Kirkman v. Brown*, 93 Tenn. 476, 27 S.W. 709, 710 (Tenn. 1894). When an adverse possessor holds the land for a period of twenty years, even absent any assurance or color of title, the title vests in that possessor. *Cooke v. Smith*, 721 S.W.2d 251, 255-56 (Tenn. Ct. App. 1986).

*Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 377 (Tenn. 2007). As our Supreme Court stated in *Bensdorff v. Uihlein*: "the law is well settled that inclosure is unnecessary to establish actual possession where such inclosure is impracticable, but possession may be established by such use and occupation as the land, from its situation, nature, and character, admits." *Bensdorff v. Uihlein*, 177 S.W. 481, 482 (Tenn. 1915).

The Trial Court did state in its order that "Plaintiffs needed an enclosure to prove they were claiming against the world." The Trial Court, however, made this statement after finding that the uses proven by the Pierces at trial, i.e., gardening, maintaining, mowing, and raising chickens and rabbits, were proven to be discontinued and only temporary uses. The Pierces assert that it was error for the Trial Court to require enclosure to prove adverse possession.

While we agree that fencing or enclosure is not required in all cases to prove

-10-

adverse possession, we disagree that the Trial Court erred. A careful reading of the Trial Court's order reveals that the Trial Court was stating that given the temporary and discontinued uses that were proven at trial, an enclosure would have been necessary to prove adverse possession *in this case*. Whether adverse possession has been proven is a highly factual determination and the Trial Court was noting that *given the facts proven in this case*, something more, such as an enclosure, would have been necessary to prove adverse possession.

The above leads us directly into a consideration of the Pierces' second issue regarding whether the Trial Court erred in finding and holding that the Pierces failed to prove adverse possession as to the entire .70 acre area in dispute. The Trial Court found and held that the Pierces proved adverse possession as to the portion of the Disputed Area to the west and south of the Boundary Line. We will discuss this finding further when we consider the issue raised by the Delashmitts.

First, we will consider the area to the east of the Boundary Line, for which the Trial Court found and held that the Pierces had failed to prove adverse possession. Specifically, the Trial Court found that the uses which had been proven at trial, i.e., "gardening, maintaining, mowing, raising chickens and rabbits," were temporary and had been discontinued by the time of trial. The evidence in the record on appeal does not preponderate against this finding. Mr. Pierce himself admitted during his testimony that these uses had been discontinued. He also admitted that since the electric fence was erected, he has not used the property to the east of the electric fence. As such, any alleged possession from the uses proven at trial does not satisfy the requirement that the possession be continuous in order to constitute adverse possession. Furthermore, the evidence in the record on appeal shows that the gardening and the building of the Shack, which was used by Mr. Pierce's father, were done with the permission of Mr. Wood, the Delashmitts' predecessor in title. Permissive uses of property are not adverse to the owner and, therefore, cannot constitute adverse possession. The evidence in the record on appeal does not preponderate against the Trial Court's finding that the Pierces failed to prove adverse possession as to the area to the east of the Boundary Line. We, therefore, affirm the Trial Court's holding as to this issue.

Finally, we consider the Delashmitts' issue regarding whether the Trial Court erred in finding and holding that the Pierces proved adverse possession of the area west and south of the Boundary Line. Mr. Pierce testified that he and his parents have used the driveway, a portion of which is in the Disputed Area, continuously since his mother purchased the Pierce Property in 1951. He further testified that he maintains a doghouse in this area. Terrell Delashmitt testified that Mr. Pierce has used the area west of the fence and further stated: "He's put scrap metal, concrete block, brick, got a doghouse on one corner of

-11-

it, that type of thing, got a gas tank on it." Terrell Delashmitt further testified that Mr. Pierce collected debris in the area, and never was asked to remove said debris until Mr. Delashmitt sent the letter in 2007, and that Mr. Pierce had been mowing in the area, again without being asked to stop. Terrell Delashmitt also agreed that Mr. Pierce has continued to use the driveway and has widened it. In fact, Terrell Delashmitt stated: "[i]t became a parking lot." Mr. Delashmitt also admitted that he had seen Mr. Pierce's doghouse in the Disputed Area in the early 1990s, but that he said nothing about this use until he wrote the letters to the Pierces in 2006 and 2007, and neither of these letters directly addressed this use of the property. The Trial Court found that the Pierces had proven adverse possession as to the area to the west and south of the Boundary Line, and the evidence in the record on appeal does not preponderate against this finding. We, therefore, affirm the Trial Court's holding as to this issue.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Sherman Lane Pierce and Cathryn Pierce, and their surety.

_____
D. MICHAEL SWINEY, JUDGE



EXHIBIT A