FILED

05/07/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 21, 2020 Session

## DOWNEY OIL COMPANY, INC., ET AL. v. SLYREAL PROPERTIES, INC., ET AL.

Appeal from the Chancery Court for Knox County
No. 192167-1    John F. Weaver, Chancellor

---

No. E2019-01169-COA-R3-CV

---

This appeal concerns a dispute over an easement agreement ("the Agreement"). In 1995, Samir F. Mishu and Faud E. Mishu, d/b/a M&M Investments ("M&M"), conveyed the eastern parcel of certain land it owned to Excellent Properties, L.P. ("Excellent"). The parties also entered into the Agreement, which provided for a future easement that would connect their properties. The easement's precise location and dimensions were undefined. Years passed, both properties put in curbing without cuts on their boundaries, and the easement went unutilized. In 2015, Downey Oil Company, Inc. ("Downey"), then lessee of the western parcel, sought for the first time to construct and use the easement. Slyreal Properties, Inc. ("Slyreal"), then owner of the eastern parcel, refused. Downey and M&M ("Plaintiffs," collectively) brought suit against Slyreal, Pinnacle Bank and Hugh Queener, trustee ("Defendants," collectively) in the Chancery Court for Knox County ("the Trial Court"). Defendants asserted adverse possession and abandonment. After a trial, the Trial Court ruled for Defendants. Plaintiffs appeal. We find and hold, *inter alia*, that Defendants failed to prove by clear and convincing evidence that the easement was extinguished by adverse possession or that it was abandoned by Plaintiffs. We reverse the judgment of the Trial Court, and remand for a determination of the easement's location and dimensions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Cathy H. Morton and Ryan W. Goddard, Maryville, Tennessee, for the appellants, Downey Oil Company, Inc., Faud E. Mishu, and Samir F. Mishu.

Arnold A. Stulce, Chattanooga, Tennessee, for the appellees, Slyreal Properties, Inc., Pinnacle Bank, and Hugh Queener.

**OPINION**

## Background

The two subject properties are located on the north side of Kingston Pike in West Knoxville. Cogdill Road runs south along the western boundary to Kingston Pike. Center Park Drive runs south along the eastern boundary to Kingston Pike at a traffic light. As shown in Exhibit 37 of the record, the scene looks[1] as follows:



---

[1] Image cropped slightly for formatting purposes.

In 1990, M&M, a general partnership then owning both subject properties, leased the western parcel to BP Oil Company ("BP"). In January 1995, M&M conveyed the eastern parcel to Excellent, a limited partnership owned by Pamela and Jeff Wilson. M&M and Excellent also entered into the Agreement, which provided for a future cross-easement. The Agreement stated, in part:

> 1. M&M, for itself, its successors and assigns, does hereby grant and convey unto Excellent for the benefit of Excellent, its contractors, subcontractors, tenants, invitees, heirs, successors and assigns, the permanent and perpetual non-exclusive right and easement to use approximately five parking spaces located on the M&M Site substantially as shown as a clouded area on the site plan attached hereto as Exhibit A for the parking of personal vehicles having not more than four wheels, to have access to such parking spaces in a manner substantially shown on Exhibit A, and to use such parking spaces in common with the owner of the M&M Site, its tenants, successors and assigns, and all persons claiming by or through it.

> 2. Excellent, for itself, its successors and assigns, does hereby grant and convey unto M&M, for the benefit of M&M, its contractors, subcontractors, tenants, invitees, successors and assigns, the permanent and perpetual non-exclusive right and easement to use the paved driveways which may be constructed by Excellent, its successors and assigns on the portion of the Corner Site shown and marked on Exhibit A as "Future Easement" for the purpose of pedestrian and vehicular access, ingress and egress between the M&M Site and Center Park Drive. M&M, its successors and assigns shall be responsible for repairing any damage to the paved portions of the Corner Site resulting from its use of this easement, including, but not limited to, cracking and other damage which may be caused by trucks or heavy equipment.

> 3. M&M, for itself, its successors and assigns, does hereby grant and convey unto Excellent, for the benefit of Excellent, its contractors, subcontractors, tenants, invitees, successors and assigns, the permanent and perpetual non-exclusive right and easement to use the paved driveways which may be constructed by M&M, its successors and assigns on the southerly portion of M&M Site from the area shown and marked on Exhibit A as "Future Easement" to the driveway exits at substantially the locations shown and marked on Exhibit A as "Approx. Curb Cut Locations" for the purpose of pedestrian and vehicular access, ingress and egress between the Corner Site and Kingston Pike and Cogdill Road. Excellent, its successors

- 3 -

and assigns shall be responsible for repairing any damage to the paved portions of the M&M Site resulting from its use of this easement, including but not limited to, cracking and other damage which may be caused by trucks or heavy equipment.

4. All covenants, easements, agreements, conditions and restrictions set forth in this Easement are intended to be and shall be construed as appurtenances and covenants running with the land, binding upon, inuring to the benefit of, and enforceable by, the owners of the Corner Site and the M&M Site, their respective tenants, successors, and assigns, upon the terms, provisions and conditions hereinabove set forth. This Easement shall have priority over any and all mortgages, deeds of trust, declarations, easements, liens or encumbrances whatsoever covering any part of the Corner Site or the M&M Site.

5. The owner of the M&M Site shall have the right to terminate this Easement upon ninety (90) days prior written notice to the owner of the Corner Site. In the event of such termination, the owner of the M&M Site shall, at its sole expense, install curbing or a similar barrier on the boundary between the Corner Site and the M&M Site so as to block the driveway between the parcels. Otherwise, this Easement and the rights, interests and obligations created hereunder, shall be perpetual and may be terminated or modified only by written agreement of the owner of the Corner Site and the owner of the M&M Site.

6. Excellent warrants and represents that it has (i) fee simple title to the Corner Site and, (ii) the full right and authority to execute and perform this Easement.

7. M&M represents and warrants that it has (i) fee simple title to the M&M Site and (ii) full right and authority to perform this Easement.

The Agreement was executed along with a deed to Excellent, and these were recorded together on January 25, 1995. While the Agreement referenced an Exhibit A containing more details, the precise location and dimensions of the future easement were never spelled out. At this stage, the property was "rough graded" but undeveloped. Later in 1995, Excellent installed a concrete curb without cuts along its boundary with the western parcel. In 1997, BP began developing the western parcel in order to build a gas station and a convenience store. That year, BP placed curbing without cuts on its boundary with Excellent. Neither BP nor M&M insisted on use of the easement at this time. In 2002, M&M leased the western parcel to BP's successor in interest, Downey. In February 2005, Excellent deeded the eastern parcel to Venture Enterprises, Inc. (an entity

that later became Slyreal). An office building is located on the eastern parcel. In 2010, Slyreal installed a wrought iron fence on its boundary with the western parcel. In Fall of 2015, Downey approached Slyreal about finally using the easement. After some initial discussion, Slyreal vetoed the project.

In August 2016, Downey filed suit against Slyreal in the Trial Court seeking declaratory judgment and injunctive relief. Slyreal filed an answer and counterclaim, asserting adverse possession and abandonment of the easement, among other things. After some more procedural history unfolded, including the substitution and addition of parties, Plaintiffs consisted of Downey and M&M, while Defendants consisted of Slyreal, as successor in interest to Venture Enterprises, Inc.; Pinnacle Bank, successor in interest to CapitalMark Bank & Trust, a lender holding a deed of trust; and Hugh Queener, substitute trustee. Trial was held on October 1, 2018, October 2, 2018, and January 9, 2019. We proceed to summarize the pertinent testimony from trial.

James Slyman, former President of Slyreal, and Laura Slyman, President of Slyreal, testified that the easement would be unsafe and disruptive for their businesses, particularly if it were placed in the prominent central position Plaintiffs wanted. Laura Slyman stated: "If an easement was positioned as proposed in the middle of my parking lot, it renders the right side of my parking lot basically unusable. It's a complete devastation to our parking, to our businesses, the safety." Laura Slyman stated further that "[w]e would not have purchased this building had we known that there was an easement agreement." We note that the easement had been recorded on January 25, 1995. For his part, Sam Mishu of M&M testified to his enthusiasm for the easement: "It's not easy to leave the gas station or any other business and make a left turn or go east on Kingston Pike . . . [c]onnecting property next to each other, it's a plus for everybody, for the town, for the highway, to reduce accidents, everything."

Pamela Wilson, a predecessor in interest to Slyreal and an original signatory to the Agreement, testified in part as follows regarding what she perceived to be the benefits of the easement and why curbing had been installed on the eastern property:

Q. There's something I wanted to ask you about. Who built the curbs that we see in the pictures that we have looked at, who built those curbs?
A. Are you talking on the corner site property?
Q. On the corner site property.
A. On the parking lots?
Q. On the parking lots.
A. They were a part of the original construction.
Q. And would that have been Excellent Properties that constructed that?
A. Correct.
Q. And why were those curbs built?

A. Code.

Q. Did you intend in any way to obstruct the easement or to interfere with easement access when you built those?

A. Absolutely not.

*** 

Q. You have testified that the easement agreement we are looking at, Exhibit 1, that you were given five parking spaces, correct?

A. Correct.

Q. Why were you given five parking spaces? Is there any reason behind that?

A. Yes, sir. The other variance we were given was because we could not cram 40 parking places on that property, and they let us get by with 39. So, you know, whenever this cross easement was built, it was going take out four parking places. So Mr. Mishu agreed to give us five parking spaces on his side of the property line to make us up to 40. Because any time you mess with anything that the city has already agreed to, they have got to re-agree. So when they look at it again, it's better for us to have the 40 parking places.

Q. I understand. You say this was going to remove some of your parking spaces when the easement crossed you, and that was the connection between the two parking lots?

A. Right.

Q. Would this have in your opinion destroyed your parking spots?

A. No.

Q. Why is that?

A. Well, we were going to get the other parking -- we were giving up four to get five.

Q. So you would gain an additional spot?

A. We would gain an additional parking spot.

Q. Were you concerned about any sort of danger or condition about having a connection where these hash marks are, these dotted lines, between what was labeled as a future BP station, and subsequently became a BP station, having access to Center Park Drive, were you concerned about danger to you or your tenants?

A. No.

Dennis Ragsdale, an attorney who had performed work for Sam Mishu over the years and who had drafted the Agreement, testified to why the easement was left undefined:

THE COURT: Is there anything I can look to on Exhibit A to determine the width of the easement?

THE WITNESS: No, sir. A basic driveway, they have a right to use those driveways as they are constructed. And the reason for that, Your Honor, is so as not to limit or hamstring the parties developing this property so that a building can't be placed in a certain area. So it allows flexibility to develop the property as along as [sic] the there's a provision for the ability for the other property to connect and use the driveways.

THE COURT: Do I understand at the time of the easement agreement that there was no specificity of where the easements would be on the BP property?

THE WITNESS: Yes, sir. We didn't know where the buildings were going to be. Unfortunately, that's the way it's done with a lot of shopping centers, for this reason.

In June 2019, the Trial Court entered its detailed memorandum opinion and order of dismissal. Ruling in favor of Defendants, the Trial Court found: (1) M&M lacked authority to enter into the Agreement with Excellent because M&M was then leasing the western parcel to BP and could not burden its lessee in that manner;[2] (2) that the easement was extinguished by adverse possession; (3) that Plaintiffs' action to enforce the easement was barred by adverse possession; and, (4) alternatively, that Plaintiffs abandoned the easement, all by clear and convincing evidence. In its memorandum opinion, the Trial Court stated, in part:

[on M&M's authority to enter into the easement agreement]

After M&M leased the property to BP in 1990, M&M had no right to enter upon the property or otherwise interfere with BP's quiet enjoyment of the property. *See Southern Bell Tel. & Tel Co. v. Yates*, 232 S.W.2d 796, 798-99 (Tenn. Ct. App. 1950). In other words, M&M could not burden the leased property with the easement in favor of Excellent Properties for five parking spaces and for traveling over the leased property. The copy of the lease attached to the original and amended complaint shows that a memorandum of the lease was recorded in Book 2505, Page 0882, pursuant to paragraph five of the lease, but does not show the date of the recording. However, the lease document, on its face, shows that M&M failed to reserve any right in its favor to burden the leased property with the cross-

---

[2] The Trial Court noted the parties did not raise this issue, stating: "The parties have not raised any issue in this case as to how M&M, after having leased the western parcel to BP Oil Company, was able to enter into an easement agreement burdening that same property. However, this Court includes discussion of that scenario below."

easement agreement that it executed with Excellent Properties five years later. See *Bradley v. McLeod*, 984 S.W.2d 929, 935 (Tenn. Ct. App. 1998) (deed showed on its face that it failed to reserve the right to an easement across the property conveyed). For the term of the lease, and at the time of the lease agreement, as between M&M and BP, M&M could not grant to anyone parking spaces upon the leased property or grant to anyone the right to pass over the leased property. However, the record lacks evidence as to when the memorandum of lease was recorded. If it was recorded prior to M&M's deed to Excellent, the easement agreement would not be enforceable by anyone against BP or its successors in interest. *See* Tenn. Code Ann. § 66-24-101(15). Likewise, if Excellent had actual or inquiry notice of the lease, the easement agreement would not have been enforceable against BP irrespective of whether it had been recorded. However, the record is deficient in this regard.

Putting aside whether M&M lacked the right and authority to execute the crosseasement agreement in violation of its lease to BP, the Court's first inquiry is whether the lease agreement's omission of the location and dimensions of the right-of-way easement over Excellent's property is fatal to the creation of the easement. The easement agreement calls for the easement to be "as shown and marked on Exhibit A as 'Future Easement.'" However, the words "future easement" were never written upon Exhibit A and there is no delineation of location or dimensions whatsoever other than the plaintiffs'
argument that two faint lines or hash marks shown on Exhibit A constitute the beginning points of the easement at the common boundary between the two properties. The plaintiffs further argue that the easement is to go straight across the Excellent property to the curb cut to Center Park Drive. Regardless, the failure of an instrument to set out the location and dimensions of an easement may nonetheless result in an enforceable easement, known as a general easement. *See Mitchell v. Chance*, 149 S.W.3d 40, 45-46 (Tenn. Ct. App. 2004).

***

[on adverse possession]

The difference in elevation and curbing are directly hostile to both property holders' rights under the easement agreement — the rights of vehicular and pedestrian access, ingress and egress. If the circumstances of this case were such that the driveway had been constructed between the properties, then the occasion of its use would be relevant in determining whether the holding was adverse — i.e., whether the plaintiffs were refused. Because

the difference in elevation was never addressed and the curbs were installed after the easement agreement, it is plain to see that both property holders, as the servient estate holders, were acting hostile to the other's rights.

"The idea underlining the whole doctrine of adverse possession is that the possession should be maintained in an open and notorious manner, so as to warn the true owner tha[t] a hostile claim is being asserted to the owner's land." *Bensdorff v. Uihlein*, 177 S.W. 481, 483 (Tenn. 1915). The possession in this case was plain, open, notorious, and amply sufficient to put Downey, M&M, Excellent and Slyreal on notice. The property holders' installing of curbs, without cuts, along the common boundary, in the face of the difference in elevation, unmistakably indicated that the servient property holder was asserting dominion over the easement, contrary to the rights of the dominant property holder. The plaintiffs argue that local laws required the installing of curbs. However, no argument was made that local laws prevented curb cuts or prohibited reducing the slope and elevation difference to make the properties accessible to each other.

There is no question in this case but that Excellent constructed the concrete curb separating its property in 1995 and that BP constructed the concrete curb separating his property in 1997. Excellent knew about the easement agreement, while there is no proof that BP had knowledge of the easement agreement other than the oral notice from Mr. Mishu to the construction superintendent in 1997. Mr. Mishu, however, did not know anything about the capacity of the unidentified superintendent to BP. There is no issue that each property owner intended to construct a concrete curb, which is referred to in the easement agreement as a barrier. M&M permitted its lessee, BP, to construct the curb. Downey continued to maintain the curb in its uncut form. BP and Downey kept the leased premises at a higher elevation without objection from M&M. No issue has been raised in the case concerning "tacking" to establish the requisite number of years for adverse possession in this case, there being no hiatus periods. *See Cumulus Broadcasting, Inc. v. Shim*, 226 S.W.3d 366, 377 (Tenn. 2007).

"[F]encing or enclosing property is an act that is most effective in demonstrating adverse possession." *Michael v. Jakes*, 2002 WL 1484448 at *10 (Tenn. Ct. App. July 12, 2002). In this case, the property holders marked or separated their properties with concrete curbs without cuts. The possession of each property holder is adverse to the other irrespective of notice of the easement agreement or intent. *See Cumulus Broadcasting, Inc. v. Shim*, 226 S.W.3d at 378 (discussing *Gibson v, Shuler*, 194 S.W.2d 865, 866-67 (Tenn. Ct. App. 1946)). Contrary to the petitioners' argument,

there is no reason for the above principle to be limited to boundary line cases and not applied to the context of adverse possession as a whole.

***
[on abandonment]

Here, Mr. Mishu told BP's apparent construction superintendent about the easement during the development of the BP project, but BP proceeded with the development as if the easement did not exist. Likewise, Mr. Mishu nor anyone else did anything on behalf of M&M to facilitate use of the easement on the property leased to BP or across the property conveyed to Excellent, now owned by Slyreal. For over 20 years, no one sought to develop or maintain the easement on either property. BP, as well as M&M and Excellent, left the properties with a $5 \frac{1}{2}$ foot grade difference rendering the two properties impassable by vehicle from one property to the other. Each property holder constructed a concrete curb across the other's easement further rendering the easement impossible for passage by vehicles from the other property holder's parcel. Moreover, for about $6 \frac{1}{2}$ years, Downey and M&M made no objection to Slyreal's construction and maintenance of a fence along the western boundary of Slyreal's property. The purpose of the fence was to stop customers of Downey from parking their cars on Slyreal's property and walking across Slyreal's property to Downey's store. Finally, BP developed and continued to utilize ingress and egress at Cogdill Road and at Kingston Pike without indicating any intent, for more than 19 years, to use ingress and egress from Center Park Drive. The evidence in this case is clear and convincing that the holders of the BP/Downey property evidenced an intent to abandon and not use any easement to Center Park Drive and, during the same period of time, to not recognize any easement in favor of Slyreal or Excellent for parking spaces or passage to Cogdill Road.

Plaintiffs timely appealed to this Court.

## Discussion

Plaintiffs raise four issues on appeal, but we consider two of these issues duplicative. We therefore restate and consolidate Plaintiffs' issues into the following three dispositive issues: 1) whether the Trial Court erred in finding that M&M had no authority to enter into the Agreement; 2) whether the Trial Court erred in finding that the easement was extinguished by adverse possession; and, 3) whether the Trial Court erred in finding that Plaintiffs abandoned the easement.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Certain of the issues on appeal implicate the clear and convincing burden of proof. "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992).

"An easement is a right an owner has to some lawful use of the real property of another." *Pevear v. Hunt*, 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996) (citing *Brew v. Van Deman*, 53 Tenn. (6 Heisk) 433 (1871)). There are a number of ways an easement can be created in Tennessee, including by these methods: (1) express grant, (2) reservation, (3) implication, (4) prescription, (5) estoppel, and (6) eminent domain. *Id*. at 115-16. There appears to be no dispute that the purported easement in this case, should an enforceable one exist, is an express easement.

The purported easement lacks specific dimensions or a precise location. As noted by the Trial Court, such an easement still may be enforced, however. Regarding general easements, this Court has stated:

> If the description of the easement in the deed or other instrument is inadequate or nonexistent, the courts may consider extrinsic evidence to ascertain the parties' intent regarding the location and dimensions of the easement. *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1237-38 (Colo. 1998); *Anchors v. Manter*, 714 A.2d 134, 140 (Me. 1998); *Highway 7 Embers, Inc. v. Northwestern Nat'l Bank*, 256 N.W.2d 271, 277 (Minn. 1977); *Sacco v. Narragansett Elec. Co.*, 505 A.2d 1153, 1155-56 (R.I.1986); *R.C.R., Inc. v. Rainbow Canyon, Inc.*, 978 P.2d 581, 586 (Wyo. 1999). The courts should take into consideration (1) the purpose of the easement, (2) the geographic relationship between the dominant and the servient tenements, (3) the use of each of the tenements, (4) the benefit to the easement holder compared to the burden on the servient tenement owner, (5) the admissions of the parties, and (6) the use existing at the time of the easement's creation. THE LAW OF EASEMENTS § 7:6.

*Mitchell v. Chance*, 149 S.W.3d 40, 46 (Tenn. Ct. App. 2004).

Having reviewed the relevant law on easements, we now address Plaintiffs' issues, the first being whether the Trial Court erred in finding that M&M had no authority to enter into the Agreement. Plaintiffs correctly observe that neither party raised this issue below. Rather, the Trial Court brought it up on its own. Plaintiffs argue that any potential issue with M&M's authority to enter the Agreement when it was leasing the property to BP is moot because the current lessee, Downey, approves of the Agreement. Further complicating matters, Defendants did not address in their brief this issue on appeal. The Trial Court itself noted that the record lacks evidence with regard to when the memorandum of lease was recorded, or whether Excellent had notice of BP's lease.

The Trial Court has raised an interesting and thoughtful question. If M&M attempted to burden its lessee with a cross-easement agreement without that lessee's consent during the term of its lease and that lessee opposed the burden, this case might well have a different outcome. That is not the scenario before us. BP was lessee of the western parcel at the time the Agreement was executed, but BP is not a party to this appeal. We may not assume to know what BP's stance is or was. We do know that BP's successor, Downey, has no issue with the Agreement, and, in fact, is suing along with M&M to enforce the Agreement. Barring some other evidence to the contrary, M&M could bargain for an agreement burdening its own property. No such evidence to the contrary is forthcoming. The question is, therefore, moot. We reverse the Trial Court in its finding that M&M lacked authority to enter into the Agreement.

We next address whether the Trial Court erred in finding that the easement was extinguished by adverse possession. Our Supreme Court has discussed adverse possession as follows:

> In order to establish adverse possession under this [common law] theory, or in any statutorily based claim, the possession must have been exclusive, actual, adverse, continuous, open, and notorious for the requisite period of time. *Hightower v. Pendergrass*, 662 S.W.2d 932, 935 n. 2 (Tenn. 1983); *cf. Menefee v. Davidson County*, 195 Tenn. 547, 260 S.W.2d 283, 285 (Tenn. 1953). Adverse possession is, of course, a question of fact. *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005). The burden of proof is on the individual claiming ownership by adverse possession and the quality of the evidence must be clear and convincing. *O'Brien v. Waggoner*, 20 Tenn.App. 145, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936). The actual owner must either have knowledge of the adverse possession, or the possession must be so open and notorious to imply a presumption of that fact. *Kirkman v. Brown*, 93 Tenn. 476, 27 S.W. 709, 710 (Tenn. 1894). When an adverse possessor holds the land for a period of twenty years,

even absent any assurance or color of title, the title vests in that possessor. *Cooke v. Smith*, 721 S.W.2d 251, 255-56 (Tenn.Ct.App.1986).

Successive possessions, or tacking, may be utilized to establish the requisite period of years if there is no hiatus. *Ferguson*, 190 S.W. at 552; *Catlett v. Whaley*, 731 S.W.2d 544, 545-46 (Tenn. Ct. App. 1987). . . .

*Cumulus Broadcasting, Inc. v. Shim*, 226 S.W.3d 366, 377 (Tenn. 2007) (footnote omitted).

This case, however, does not feature a boundary dispute. Rather, it concerns the enforceability of an easement. Both sides grapple with *Boyd v. Hunt*, 52 S.W. 131 (Tenn. 1899), an older Tennessee case analyzing adverse possession in the context of an easement. *Boyd* featured a written grant of easement through an alleyway onto a street. *Id*. The defendants had erected gates and doors blocking the easement. *Id*. at 132. The plaintiffs' efforts to enforce the easement were opposed by the defendants who asserted, in part, that the "defendants, and those from whom they claim, have been in open, exclusive, and adverse possession of that part of the alley in the rear of their lot since 1859, so that the easement now claimed by complainants has been long since extinguished." *Id*. at 131. Our Supreme Court rejected this argument, stating:

These gates and doors might have stood for an indefinite time, and the defendants might have asserted to others their exclusive claim; yet, if they did not make it known to those entitled to the easement as an appurtenant to their estate by debaring them from its enjoyment, or otherwise asserting such adverse right, they would not be affected by it. Their mere maintenance of these gates and doors was not inconsistent with the rights of these parties. They might well assume that they were erected to prevent intrusion into the alley, and in the interest of all to secure it from the commission of nuisances by outsiders.

*Id*. at 133-34.

Plaintiffs also cite a more recent case as additional support for their argument, albeit one from another jurisdiction. The Supreme Court of Colorado, relying in large measure on a rule articulated in the New York case of *Castle Associates v. Schwartz*, 63 A.D.2d 481, 407 N.Y.S.2d 717 (1978), held as follows regarding when an express easement is terminated by adverse possession:

When an easement is expressly created but never used, we hold that use of the easement area is not adverse and will not trigger the statutorily-

mandated period of time for adverse possession until the easement holder needs to use the easement, demands to use it, and is denied the right to use it.

*Matoush v. Lovingood*, 177 P.3d 1262, 1265 (Colo. 2008).

We agree with Plaintiffs that the proper analysis for adverse possession in a boundary dispute differs somewhat from the analysis employed in a dispute over an express easement. Plaintiffs make no claims to any of Defendants' land, as such. The issue herein is not that of a boundary. Rather, it is about use of land. That which may reflect adverseness in the boundary context may not reflect adverseness in the case of an express easement. The record reflects that Downey only approached Slyreal about using the easement in 2015. There is no evidence that Downey, BP, or M&M ever had attempted to use the easement before then only to be rejected. The Agreement was duly recorded. It remains on the books; it did not simply go away. That the easement has yet to be constructed is not necessarily dispositive.

The Trial Court relied heavily on the installation of curbs without cuts as evidence of adverseness. However, Pamela Wilson testified that Excellent installed the curbs to be consistent with code, not to bar M&M. Intentions aside, there was no easement to block. The easement existed on paper, to be constructed at a later date. In the meantime, the parties could develop their respective properties. When Downey attempted to move forward with the easement in 2015, it was rebuffed. Before then, Excellent's and later Slyreal's actions were simply those of property owners doing with their property as they saw fit. In short, a curb did not signal adverseness; Slyreal's refusal to let Downey begin work on the easement did.

The Trial Court relied also upon the elevation difference between the properties. The western parcel is about five and a half feet higher than the eastern parcel. This difference is of no account because the evidence reflects that the properties have been on different elevations since the Agreement was signed. No adverseness can be shown from a feature that existed when the Agreement was signed. A pre-existing condition such as this elevation difference is not a manifestation of adverseness; it is simply part of the land at issue.

Defendants had to clear the hurdle of clear and convincing evidence to prove adverse possession. In our judgment, they did not succeed. The adverse period began to run only in 2015 when Downey's attempt to finally utilize the express easement was rebuffed. Suit was filed in August 2016. Therefore, Defendants cannot establish the requisite 20 year period for adverse possession. Likewise, Defendants cannot rely upon the seven year period found at Tenn. Code Ann. § 28-2-103 protecting adverse holders

from suits to oust them. *See Shearer v. Vandergriff*, 661 S.W.2d 680, 682 (Tenn. 1983). Insufficient time has passed as to both. We reverse the Trial Court's finding that the easement was extinguished by adverse possession.

The final issue we address is whether the Trial Court erred in finding that Plaintiffs abandoned the easement. Tennessee law provides that "[t]he party asserting abandonment of an easement must prove it by clear, unequivocal evidence." *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998). Thus, the proper standard in an abandonment of an easement case is clear and unequivocal. Clear and convincing evidence and clear and unequivocal evidence are one and the same. *See Gambill v. Hogan*, 207 S.W.2d 356, 360-61 (Tenn. Ct. App. 1947) (equating "clear and convincing evidence" to "clear and unequivocal evidence" and "clear, cogent and convincing evidence").

Tennessee law is well-settled regarding abandonment of an easement. An easement may be abandoned, but the party attempting to prove abandonment must show both "an intention to abandon the easement [and] also external acts carrying that intention into effect." *Hall*, 984 S.W.2d at 620. Mere nonuse of the easement "is not sufficient, by itself, to prove abandonment. Nonuse must be coupled with proof that the easement holder or holders intended to abandon the easement." *Hall*, 984 S.W.2d at 620-21. The required external acts necessary to prove abandonment may be "either a single act or a series of acts." *Hall*, 984 S.W.2d at 621. Courts may consider several factors in making a determination of whether an easement has been abandoned, including:

> (1) statements by the easement holder acknowledging the easement's existence and disavowing its use, (2) the easement holder's failure to maintain the easement in a condition permitting it to be used for access, (3) the easement holder's acquiescence in the acts of others that reduce the utility of the easement, (4) the easement holder's placement of a permanent obstruction across the easement, or (5) the easement holder's development of alternative access in lieu of the easement.

*Id.*[3]

Applying factor (1) from *Hall*, the evidence shows no statements of disavowal from M&M. Indeed, the Agreement contained a specific termination clause that M&M could exercise if it wished. The provision required M&M to provide 90 days prior

---

[3]While these factors were applied to an unrecorded easement in *Hall*, we regard them as relevant for consideration of a recorded easement, also. *See Porter v. Freedle*, No. M2001-01892-COA-R3-CV, 2002 WL 1315555, at *3 n. 2 (Tenn. Ct. App. June 18, 2002), *Rule 11 appl. perm. appeal denied Dec. 2, 2002*. The parties and the Trial Court refer to these factors, as well.

written notice to the owner of the eastern property and place curbing or a similar barrier along its boundary. Curbing was installed, but there is no evidence that M&M ever disavowed the easement in writing. Factors (2) through (4) we regard as inapplicable because the easement has not yet been constructed or utilized. The opportunity for its maintenance has not arisen. It has thus far merely gone unused, and Tennessee law is clear that non-use alone does not constitute abandonment. The final *Hall* factor, (5), concerns the easement holder's development of alternative access in lieu of the easement. It is strictly true that Plaintiffs have alternative means of means of accessing the western parcel, both on Kingston Pike and Cogdill Road. However, the Agreement gives Plaintiffs access to Center Park Drive and thus a traffic light onto Kingston Pike. Plaintiffs have no alternative access to this traffic light—the centerpiece of their interest in the easement—in lieu of the easement.

The *Hall* factors weigh against Defendants' position. Plaintiffs' conduct over the years is akin to mere non-use, which is insufficient to show abandonment of the easement. We reverse the judgment of the Trial Court, and remand for a determination of the easement's location and dimensions.

## Conclusion

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees, Slyreal Properties, Inc. and Pinnacle Bank.

_____
D. MICHAEL SWINEY, CHIEF JUDGE